**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, |
| *Plaintiff*, |
| v. |
| **U.S. DEPARTMENT OF JUSTICE**, |
| *Defendant*. |

Case No. 1:19-cv-2267-EGS

**DEFENDANT U.S. DEPARTMENT OF JUSTICE'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.      The Campaign Finance Investigation and Related Investigation ...................... 2

II.     Plaintiff's FOIA Requests ................................................................................. 3

III.    The Instant Litigation ....................................................................................... 3

STANDARD OF REVIEW .......................................................................................... 5

ARGUMENT ............................................................................................................... 6

I.      The Department Properly Withheld Interview Reports ...................................... 6

        A.      The Interview Reports Were Properly Withheld Under Exemption 5 as
                Attorney Work Product ........................................................................... 7

                1.      Numerous Recent Decisions Recognize that FD-302s and Other
                        Reports of Interviews May Be Withheld as Attorney Work Product ........ 8

                2.      The Interview Reports Were Properly Withheld Under Exemption
                        5 As Attorney Work Product ................................................... 11

        B.      The Interview Reports Were Also Properly Withheld in Full or in Part
                Under Exemptions 6 and 7(C) To Protect Personal Privacy................................ 13

                1.      The Cooperating Witnesses and Third Parties Mentioned in the
                        Interview Reports Have Compelling Privacy Interests in Avoiding
                        Disclosure ............................................................................... 15

                2.      Disclosure of the Interview Records Would Provide Little Public
                        Benefit..................................................................................... 18

                3.      The Balance Tips Strongly In Favor of Withholding the Interview
                        Records .................................................................................... 20

II.     The Department Properly Withheld Records Discussed in the Interviews....................... 21

        A.      Documents Selected for Use in Interviews Constitute Attorney Work
                Product ................................................................................................... 21

        B.      Many of the Documents Are Also Subject to Exemptions 6 and 7(C)................. 26

III.    The Department Properly Withheld Materials Related to Search Warrants..................... 27

IV.   The Department Properly Withheld Internal Emails and Memoranda ............................ 29

    A.   The Criminal Division Records Were Properly Withheld Under
Exemption 5  Pursuant to the Attorney Work Product and Deliberative
Process Privileges ................................................................................................. 29

    B.   The Filter Memoranda Were Properly Withheld Under Exemption 5
Pursuant to the Attorney Work Product and Deliberative Process
Privileges............................................................................................................... 31

    C.   The Prosecution Memoranda, Other Memoranda, And Related Emails
Were Properly Withheld Under Exemption 5 Pursuant to the Attorney
Work Product and Deliberative Process Privileges ................................................ 32

        1.   The March 30, 2018, August 9, 2018, and August 18, 2018
Prosecution Memoranda ........................................................................... 33

        2.   The November 29, 2018 Email and December 15, 2018
Memorandum and Related Email .............................................................. 34

        3.   The February 22, 2019 and March 1, 2019 Memoranda and
Related Emails .......................................................................................... 36

    D.   The Emails and Memoranda Are Subject to Other Partial Withholdings............. 38

V.   Disclosure of the Withheld Information Would Harm Interests Protected by FOIA
Exemptions ..................................................................................................................... 38

VI.   The Department Released All Reasonably Segregable, Non-Exempt Information.......... 43

CONCLUSION......................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Am. Oversight v. U.S. Dep't of Justice,*
    19-cv-8215, 2021 WL 964220 (S.D.N.Y. Mar. 15, 2021),
    *appeal filed*, No. 21-1266 (2d Cir. May 13, 2021)........................................................ 10, 11, 13

*August v. FBI,*
    328 F.3d 697 (D.C. Cir. 2003) ................................................................................................ 5

*Boyd v. Crim. Div. of U.S. Dep't of Justice,*
    475 F.3d 381 (D.C. Cir. 2007) .............................................................................................. 18

*Branch v. FBI,*
    658 F. Supp. 204 (D.D.C. 1987) ........................................................................................... 16

*Brayton v. Off. of the U.S. Trade Rep.,*
    641 F.3d 521 (D.C. Cir. 2011) ................................................................................................ 6

*Coastal States Gas Corp. v. U.S. Dep't of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ........................................................................................ 23, 39

*CREW v. U.S. Dep't of Justice,*
    746 F.3d 1082 (D.C. Cir. 2014) ................................................................................ 14, 16, 19

*CREW v. U.S. Dep't of Justice,*
    854 F.3d 675 (D.C. Cir. 2017) ........................................................................................ 16, 19

*Dep't of Air Force v. Rose,*
    425 U.S. 352 (1976) .............................................................................................................. 14

*Encino Motorcars, LLC v. Navarro,*
    138 S. Ct. 1134 (2018) ............................................................................................................ 6

*FBI v. Abramson,*
    456 U.S. 615 (1981) ................................................................................................................ 6

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) .............................................................................................. 16

*Food Mktg. Inst. v. Argus Leader Media,*
    139 S. Ct. 2356 (2019) ............................................................................................................ 6

*FTC v. Grolier Inc.,*
    462 U.S. 19 (1983) ............................................................................................................ 8, 40

*Fund for Const. Gov't v. Nat'l Archives & Records Serv.,*
    656 F.2d 856 (D.C. Cir. 1981) .............................................................................................. 16

*Fund for Const'l Gov't v. Nat'l Archives & Records Serv.*,
  485 F. Supp. 1 (D.D.C. 1978) ........................................................... 40

*Gilliam v. U.S. Dep't of Justice*,
  128 F. Supp. 3d 134 (D.D.C. 2015) ..................................................... 6

*Hickman v. Taylor*,
  329 U.S. 495) (1947) ............................................................ 8, 25, 39, 42

*In re Martin Marietta Corp.*,
  856 F.2d 619 (4th Cir. 1988) .............................................................. 24

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ...................................................... 22, 23

*In re Subpoenas Duces Tecum*,
  738 F.2d 1367 (D.C. Cir. 1984) ........................................................... 24

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ............................................................................. 5

*Jordan v. U.S. Dep't of Justice*,
  591 F.2d 753 (D.C. Cir. 1978) ........................................................... 39

*Juarez v. Dep't of Justice*,
  518 F.3d 54 (D.C. Cir. 2008) ............................................................. 44

*Judicial Watch v. U.S. Dep't of Def.*,
  963 F. Supp. 2d 6 (D.D.C. 2013) ....................................................... 24

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
  715 F.3d 937 (D.C. Cir. 2013) ............................................................. 6

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
  926 F. Supp. 2d 121 (D.D.C. 2013) ............................................... 7, 30

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
  432 F.3d 366 (D.C. Cir. 2005) ............................................................. 8

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
  806 F. App'x 5 (D.C. Cir. 2020) ............................................... 9, 13, 44

*Judicial Watch, Inc. v. U.S. Department of Justice*,
  391 F. Supp. 3d 43 (D.D.C. 2019) .................................................... 8, 9

*Kimberlin v. U.S. Dep't of Justice*,
  139 F.3d 944 (D.C. Cir. 1998) ........................................................... 17

*Leopold v. U.S. Department of Justice*,
    487 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 9, 13, 41

*Light v. U.S. Dep't of Justice*,
    968 F. Supp. 2d 11 (D.D.C. 2013) ............................................................................. 6

*Martin v. Off. of Special Counsel, Merit Sys. Prot. Bd.*,
    819 F.2d 1181 (D.C. Cir. 1987) ................................................................... 7, 10, 40

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ................................................................................. 43

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ................................................................................... 6

*Nation Magazine v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) .......................................................................... *passim*

*Nat'l Archives & Recs. Admin. v. Favish*,
    541 U.S. 157 (2004) ................................................................................... 14, 18, 19

*Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice*,
    844 F.3d 246 (D.C. Cir. 2016) ............................................................................. 8, 44

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
    402 F. Supp. 2d 211 (D.D.C. 2005) .................................................................. 43, 44

*New York Times Co. v. U.S. Department of Justice*,
    138 F. Supp. 3d 462 (S.D.N.Y. 2015),
    *aff'd in part, rev'd in part and remanded on other grounds*, 939 F.3d 479 (2d Cir. 2019)...... 10

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ................................................................................................. 39

*Nova Oculus Partners, LLC v. SEC*,
    486 F. Supp. 3d 280 (D.D.C. 2020) .................................................................. 14, 17

*Reed v. NLRB*,
    927 F.2d 1249 (D.C. Cir. 1991) ............................................................................... 14

*Reporters' Comm. for Freedom of the Press v. FBI*,
    --- F.4th ---, 2021 WL 2753938 (D.C. Cir. July 2, 2021) ................................ 38, 41, 42, 43

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
    235 F.3d 598 (D.C. Cir. 2001) ...................................................................... *passim*

*Russell v. Dep't of the Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) ............................................................................... 39

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 16, 27, 30

*Schoenman v. FBI*,
    575 F. Supp. 2d 166 (D.D.C. 2008) ...................................................................... 14

*Senate of Puerto Rico v. U.S. Dep't of Justice*,
    823 F.2d 574 (D.C. Cir. 1987) ............................................................................. 28

*Sourgoutsis v. U.S. Capitol Police*,
    323 F.R.D. 100 (D.D.C. 2017) ............................................................................. 30

*Stern v. FBI*,
    737 F.2d 84 (D.C. Cir. 1984) ................................................................... 16, 17, 27

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ........................................................................ 7, 10

*U.S. Dep't of Def. v. FLRA*,
    510 U.S. 487 (1994) ........................................................................... 14, 19, 20, 26

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) .............................................................................................. 14

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) ......................................................................................... 20, 28

*U.S. Dep't of State v. Washington Post Co.*,
    456 U.S. 595 (1982) ......................................................................................... 14, 15

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    141 S. Ct. 777 (2021) ........................................................................................ 7, 30

*United States v. AT&T*,
    642 F.2d 1285 (D.C. Cir. 1980) ................................................................ 22, 23, 40

*United States v. Deloitte, LLP*,
    610 F.3d 129 (D.C. Cir. 2010) ................................................................... 9, 24, 40

*United States v. Nobles*,
    422 U.S. 225 (1975) ................................................................................... 7, 12, 22

*Williams & Connolly v. SEC*,
    662 F.3d 1240 (D.C. Cir. 2011) .................................................................. 8, 23, 26

*Winterstein v. U.S. Dep't of Justice, Off. of Info. & Privacy*,
    89 F. Supp. 2d 79 (D.D.C. 2000) ........................................................................... 7

## STATUTES

5 U.S.C. § 552 .............................................................................................. *passim*

## RULES

Fed. R. Civ. P. 26 .............................................................................. 7, 12, 30

Fed. R. Civ. P. 56 ........................................................................................ 6

Fed. R. Crim. P. 6 ............................................................................... *passim*

Fed. R. Crim. P. 41 ..................................................................................... 28

## OTHER AUTHORITIES

Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning
   the Freedom of Information Act (Mar. 19, 2009),
    http://www.usdoj.gov/ag/foia/memo-march2009.pdf. ................................ 38

Freedom of Information Act,
   74 Fed. Reg. 4683 (Jan. 21, 2009) ........................................................... 38

H.R. Rep. No. 114-391 (2016) ................................................................... 38

S. Rep. No. 114-4 (2015) ............................................................................ 38

## INDEX OF EXHIBITS

- Exhibit A, Declaration of Thomas McKay
- Exhibit B, Declaration of Ebony Griffin
  - Exhibit B-1, EOUSA's *Vaughn* Index
  - Exhibit B-2, Plaintiff's FOIA Request to EOUSA
- Exhibit C, Declaration of Drew Lavine
  - Exhibit C-1, Plaintiff's FOIA Request to Criminal Division
  - Exhibit C-2, Criminal Division's Response to Plaintiff
  - Exhibit C-3, Criminal Division *Vaughn* Index
- Exhibit D, Declaration of Michael G. Seidel
  - Exhibit D-1, Plaintiff's FOIA Request to FBI
  - Exhibit D-2, July 31, 2019 Letter to Plaintiff
  - Exhibit D-3, August 1, 2019 Letter to Plaintiff
  - Exhibit D-4, June 19, 2020 Letter to Plaintiff
  - Exhibit D-5, FBI *Vaughn* Indices
  - Exhibit D-6, Redacted Page from FOIA Production
- Exhibit E, Declaration of Timothy A. Ziese
  - Exhibit E-1, Plaintiff's FOIA Request to OIP
  - Exhibit E-2, OIP Acknowledgment Letter to Plaintiff
  - Exhibit E-3, OIP's Final Response Letter to Plaintiff
- Exhibit F, Statement of Undisputed Facts

## INTRODUCTION

This case concerns a set of Freedom of Information Act ("FOIA") requests sent by Citizens for Responsibility and Ethics in Washington ("CREW" or "Plaintiff") to various components of the Department of Justice ("the Department" or "Defendant"). The FOIA requests sought documents relating to the investigation into (1) who, besides Michael Cohen, was involved in and may be liable for the campaign finance violations to which Mr. Cohen pled guilty, and (2) whether certain individuals made false statements, gave false testimony, or obstructed justice in connection with the investigation.

After conducting a search for responsive documents, the Department produced various documents, or portions of documents, to Plaintiff. But given the subject matter of Plaintiff's FOIA request – which seeks records relating to a federal law enforcement investigation and prosecution – much of the responsive information was naturally subject to several of FOIA's exemptions that apply despite the fact that Mr. Cohen's criminal case is over. Accordingly, the Department withheld material to protect attorney work product, government deliberations, grand jury information, law enforcement techniques, and the privacy of individuals mentioned in law enforcement files.

The parties have met and conferred and agreed that the only issues remaining in dispute are the appropriateness of the Department's withholdings pursuant to FOIA Exemptions 5, 6, and 7(C). The Department's search and its withholdings pursuant to Exemption 3 and Federal Rule of Criminal Procedure 6(e) (among other things) are *not* in dispute. The documents that remain in dispute generally fall into four categories: (1) records memorializing prosecutors' and investigative agents' summaries and notes of witness interviews; (2) documents used during those interviews; (3) documents related to search warrant applications; and (4) internal emails and memoranda concerning the investigations and prosecution.

The Department has properly withheld these documents in full or in part because they contain information that is exempt from production under FOIA. *First*, the notes and summaries of witness interviews have been withheld in full or in part under Exemption 5 because these documents constitute attorney work product, and they also have been properly withheld in full or in

1

part pursuant to Exemption 6 and Exemption 7(C) to protect the privacy of the cooperating witnesses and third parties. *Second*, documents used during those interviews have also been properly withheld in full because they constitute attorney work product, and they also have been withheld in full or in part pursuant to Exemptions 6 and 7(C) to protect the privacy of the witnesses and third parties. *Third*, documents relating to search warrant applications have been withheld in full under Exemptions 6 and 7(C) because disclosure of these documents, even in part, would likely reveal the undisclosed identities of the individuals whose property was the subject of the search warrants. *Fourth*, the internal emails and memoranda have been withheld in full or in part under Exemption 5 because they are attorney work product, and also because disclosure of many of these documents would reveal protected government deliberations. Information contained within this final category of documents also is protected by Exemptions 6 and 7(C) because disclosure would result in an unwarranted invasion of personal privacy.

As discussed below, the Department has submitted declarations from various departmental components that justify its withholdings. The Department is entitled to summary judgment.

## BACKGROUND

### I.    The Campaign Finance Investigation and Related Investigation

In 2018 and early 2019, a team of SDNY prosecutors, together with Special Agents of the FBI and SDNY, conducted an investigation of potential campaign finance violations by Michael Cohen and others (the "campaign finance investigation"). Ex. A, Decl. of AUSA Thomas McKay ("McKay Decl."), ¶ 6. This investigation resulted in Mr. Cohen being charged pursuant to a criminal Information with one count of causing an unlawful corporate contribution and one count of making an excessive campaign contribution. *Id.* ¶ 7. Mr. Cohen was also charged with five counts of tax evasion and one count of making false statements to a bank. *Id.* On August 21, 2018, Mr. Cohen pleaded guilty before the Hon. William H. Pauley III pursuant to a plea agreement. *Id.* ¶ 8. Mr. Cohen was sentenced and a judgment of conviction was entered on December 12, 2019. *Id.* No other individuals were charged as a result of SDNY's campaign finance investigation. *Id.* ¶ 7.

SDNY prosecutors, assisted by Special Agents of the FBI and SDNY, also conducted an investigation (the "related investigation") into whether certain individuals made false statements, gave false testimony, or otherwise obstructed justice in connection with the underlying investigation. McKay Decl. ¶ 9. No individuals were charged as a result of the related investigation. *Id.*

Other than Mr. Cohen, the government has not acknowledged the particular individual or individuals who were the subjects of the SDNY's investigations. McKay Decl. ¶ 25. It is the SDNY's general practice not to publicly identify subjects of criminal investigation, or other persons of investigative interest, who are not charged. *Id.* Likewise, the SDNY generally does not disclose or acknowledge whether or not specific individuals have provided interviews or otherwise cooperated with an investigation. *Id.* ¶ 24. The government is aware that four individuals have publicly acknowledged that they provided statements to the government as part of the SDNY's investigations: Michael Cohen, Keith Davidson, John Gauger, and Robert Costello. *Id.* ¶ 22.

## II.    Plaintiff's FOIA Requests

On July 18, 2019, Plaintiff submitted the four FOIA requests at issue. The requests were sent to different components of the Department of Justice, specifically the Criminal Division, the Executive Office of U.S. Attorneys ("EOUSA"), the Federal Bureau of Investigation ("FBI"), and the Office of Information Policy ("OIP"). Each request stated that it was seeking records "related to the now closed investigation conducted by the U.S. Attorney's Office for the Southern District of New York into (1) who, besides Michael Cohen, was involved in and may be criminally liable for the two campaign finance violations to which Mr. Cohen pled guilty; and (2) whether certain individuals made false statements, gave false testimony, or otherwise obstructed justice in connection with the investigation."

## III.    The Instant Litigation

On July 30, 2019, Plaintiff filed its first complaint in this matter. ECF No. 1. Plaintiff filed an amended complaint on August 23, 2019. ECF No. 6. After Defendant answered the amended complaint (ECF No. 8), the parties met and conferred and agreed to narrow the scope of Defendant's searches for potentially responsive documents. ECF No. 9. Ultimately, Defendant agreed to

search for certain categories of documents, including: FD-302s and other witness statements, search warrant applications and supporting affidavits, prosecution memoranda, other memoranda relating to the investigation, and certain records that were sent to or from former Attorney General William Barr or former Deputy Attorney General Rod Rosenstein. *Id.*

Defendant made its first production of records on February 7, 2020, and continued making periodic productions through December 23, 2020. Defendant made a supplemental production to Plaintiff on July 30, 2021. Defendant withheld various records in whole or in part pursuant to FOIA exemptions 3, 5, 6, 7(A), 7(C), and 7(E). On March 3, 2021, the parties filed a joint status report indicating that they had met and conferred and determined that Plaintiff would not challenge the adequacy of Defendant's search for responsive records, and that the only items that remain in dispute are the appropriateness of Defendant's withholdings pursuant to FOIA Exemptions 5, 6, 7(A), and 7(C). ECF No. 21. Plaintiff further indicated that it did not challenge Defendant's withholdings made pursuant to Exemption 3 and Federal Rule of Criminal Procedure 6(e) or FOIA Exemption 7(E).[1] Because the FBI is no longer asserting Exemption 7(A), that Exemption is no longer at issue.[2] Seidel Decl. ¶ 12 n.3. Subsequently, Plaintiff agreed not to challenge withholdings of identifying information of lower-level government employees.

The Criminal Division processed 133 pages of records, 25 of which were referred to EOUSA. Ex. C, Declaration of Drew Lavine, ¶ 18 ("Lavine Decl."). Withholdings of the other Criminal Division records that remain at issue are principally discussed in the Lavine Declaration and associated *Vaughn* Index. *See* Ex. C-3 (Criminal Division index). The Lavine Declaration and associated index do not address withholdings made pursuant to exemptions that are no longer at issue, namely material protected by Exemption 3 and Federal Rule of Criminal Procedure 6(e), or

---

[1] In later discussions among the parties, Plaintiff inquired into one Exemption 7(E) redaction, and Defendant offered to discuss that redaction in its *Vaughn* index and declarations. The relevant discussion occurs at Ex. D, Declaration of Michael Seidel ("Seidel Decl."), ¶ 34.

[2] The material previously withheld under Exemption 7(A) continues to be withheld under Exemption 7(E). Seidel Decl. ¶ 12 n.3.

names and identifying information of lower-level government employees protected by Exemptions 6 and 7(C). *See* Lavine Decl. ¶¶ 20, 42 n.6. OIP processed 96 pages of record, 59 of which were referred to FBI and 37 of which were referred to EOUSA. Ex. E, Declaration of Timothy Ziese, ¶ 6 ("Ziese Decl."). The 59 pages referred to FBI were all withheld pursuant to Exemption 3 and Federal Rule of Criminal Procedure 6(e), and therefore are no longer at issue. Seidel Decl. ¶ 8. FBI processed a total of 1,924 pages of records, including the 59 pages referred from OIP. *Id.* ¶ 4. The remainder of the records processed by FBI were either duplicates or were referred to EOUSA after FBI noted proposed redactions. *Id.* ¶¶ 4, 10-11. EOUSA located and processed various interview records, prosecution memoranda, and search warrant materials. Ex. B, Declaration of Ebony Griffin, ¶¶ 10-12 ("Griffin Decl.").

The EOUSA index lists all of the documents that remain at issue except for the documents for which the Criminal Division conducted the final processing.[3] Those documents are listed on the Criminal Division index. Thus, the complete list of records that remain at issue consists of the documents listed in the Criminal Division index and the EOUSA index. However, the declarations and indices from other components are cited herein to justify the Department's withholdings.[4]

## STANDARD OF REVIEW

Although the Freedom of Information Act "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure require-

---

[3] The EOUSA index lists only records that were (1) ultimately processed by EOUSA, and (2) not fully covered by an unchallenged withholding. Griffin Decl. ¶ 5.

[4] Should any of the withholdings that the Department believes are no longer challenged by Plaintiff later be disputed, the Department reserves the right to assert all exemptions that may be applicable to the withheld information.

ment." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up) (quoting *FBI v. Abramson*, 456 U.S. 615, 630-31 (1981) and *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)). The Department bears the burden of justifying its withholdings of materials responsive to Plaintiff's FOIA request, and this Court reviews the Department's response to that request *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. U.S. Dep't of Justice*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The defendant in a FOIA case must show . . . that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. U.S. Dep't of Justice*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam).

## ARGUMENT

### I.    The Department Properly Withheld Interview Reports

As a result of their searches for potentially responsive documents, the FBI and SDNY located various reports and notes of interviews conducted as part of the SDNY's campaign finance and related investigations. These materials (collectively, the "interview reports") include FBI Form

FD-302 ("FD-302") reports of interviews, interview memoranda prepared by SDNY Special Agents, and handwritten notes.[5] *See* McKay Decl. ¶¶ 5(a), 11-13. The Department released redacted versions of interview reports for interviews of individuals who publicly acknowledged their participation in the investigation, while the interview reports concerning interviews of witnesses who did not acknowledge their participation have been withheld in full. Griffin Decl. ¶¶ 21-22.

### A.    The Interview Reports Were Properly Withheld Under Exemption 5 as Attorney Work Product

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Thus, "Exemption 5 incorporates the privileges available to Government agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege, and" – as relevant here – "[the] attorney work-product privilege." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021).

"The work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'" *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)). The doctrine covers "the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in anticipation of litigation." *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997); *see also Martin v. Off. of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1187 (D.C. Cir. 1987) ("The work-product privilege simply does not distinguish between factual and deliberative material."). Although the work-product doctrine applies most frequently when civil litigation is anticipated, the doctrine's "role in assuring the proper functioning of the criminal justice system is even more vital." *United States v. Nobles*, 422 U.S. 225, 238 (1975). Accordingly, documents prepared in anticipation of criminal prosecutions may be withheld as attorney work product. *See, e.g.*, *Winterstein v. U.S. Dep't of Justice, Off. of Info. & Privacy*, 89 F. Supp. 2d 79,

---

[5] The interview memoranda prepared by SDNY Special Agents are functionally very similar to the FD-302s prepared by FBI Special Agents. Both types of records document what occurred in the interviews. McKay Decl. ¶ 10.

79, 81 (D.D.C. 2000) (concluding there was "no question" that a DOJ Office of Special Investigations memo "prepared during the course of an investigation" was prepared in anticipation of litigation given "the contemplated prosecution" of the investigation's target).

In both the civil discovery and FOIA contexts, the D.C. Circuit has instructed that the attorney work product doctrine "should be interpreted broadly and held largely inviolate." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 432 F.3d 366, 369-70 (D.C. Cir. 2005) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11) (1947)). Although it is true that in civil discovery "work product protection may be overcome for cause," that is not the case in FOIA. *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011). To the contrary, since work product materials "are not 'routinely' or 'normally' discoverable," they always "are exempt under FOIA." *Id.*; *see also FTC v. Grolier Inc.*, 462 U.S. 19, 27 (1983) ("Whether its immunity from discovery is absolute or qualified, a protected document cannot be said to be subject to 'routine' disclosure."). An agency need not segregate material that is fully protected as work product, as "there are no non-exempt portions left to segregate." *Nat'l Assn' of Crim. Def. Lawyers v. U.S. Dep't of Justice*, 844 F.3d 246, 256 (D.C. Cir. 2016).

### 1. Numerous Recent Decisions Recognize that FD-302s and Other Reports of Interviews May Be Withheld as Attorney Work Product

In light of these principles, it is unsurprising that many courts – including the D.C. Circuit – have held that FD-302s in circumstances similar to this case constitute attorney work product and are properly withheld under Exemption 5. For example, in *Judicial Watch, Inc. v. U.S. Department of Justice*, Judge Collyer considered the Department's withholding of FD-302s that had been prepared during the criminal investigation of former Illinois Governor Rod Blagojevich. 391 F. Supp. 3d 43, 47 (D.D.C. 2019). The FD-302s memorialized interviews of then-President Barack Obama, his former chief of staff Rahm Emanuel, and former senior adviser Valerie Jarrett. *Id.* The Department submitted a declaration prepared by a member of the prosecution team indicating that the interviews memorialized in the FD-302s took place the same month as Mr. Blagojevich's arrest and had been conducted "for the purpose of gathering evidence that could be presented to a grand

jury and that could factor into the case to be presented at the trial." *Id.* at 51. Relying on that declaration, Judge Collyer held that the FD-302s "were prepared in anticipation of litigation," *id.*, and accordingly "are records exempt from FOIA release as attorney work product under Exemption 5," *id.* at 53.

The D.C. Circuit unanimously affirmed. Like Judge Collyer, the panel noted that the three interviews at issue took place around the time of Mr. Blagojevich's arrest and were "undertaken 'for the purpose of gathering evidence that could be presented to a grand jury and that could factor into the case to be presented at the trial.'" *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 806 F. App'x 5, 7 (D.C. Cir. 2020) (per curiam) (mem.). Recognizing that the interviews were conducted at the direction of career prosecutors, and that prosecutors had "participated in determining the investigative strategy for each interview and in questioning the witnesses," the court of appeals held that the FD-302s thus "reflect 'the thoughts and opinions of counsel developed in anticipation of litigation' so as to fall within the attorney work-product privilege." *Id.* (quoting *United States v. Deloitte, LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010)). "Consequently," the D.C. Circuit "affirm[ed] the district court's determination that the FD-302s are fully exempt from disclosure under FOIA Exemption 5." *Id.*

In *Leopold v. U.S. Department of Justice*, Judge Walton considered the Department's withholdings of FD-302s that had been compiled as part of Special Counsel Robert Mueller's investigation into Russian interference in the 2016 presidential election. 487 F. Supp. 3d 1, 7 (D.D.C. 2020). The Department had submitted a declaration stating that attorneys and FBI personnel associated with the Special Counsel's Office had conducted "approximately 500 witness interviews during its investigation," and that these interviews were conducted "for the purpose of gathering or otherwise assessing the extent to which evidence could be obtained to support criminal charges and that therefore could be presented to a grand jury and at trial." *Id.* at 11. Relying on that declaration, Judge Walton held that "the information withheld by the Department from the FD-302s pursuant to Exemption 5 based on the attorney work product privilege falls squarely within the scope of the privilege." *Id.*

The same was true in *New York Times Co. v. U.S. Department of Justice*, 138 F. Supp. 3d 462 (S.D.N.Y. 2015), *aff'd in part, rev'd in part, and remanded on other grounds*, 939 F.3d 479 (2d Cir. 2019).[6] In that case, plaintiffs sought FD-302s and other records created during the investigation into "the destruction of videotapes of CIA interrogations and into the deaths of detainees in CIA custody." *Id.* at 466. Judge Oetken endorsed the Department's withholding of the FD-302s, noting that "[t]he mere selection of whom to interview reveals a great deal about [the attorney's] strategy," and that "[s]imilarly, the questions he or his subordinates ask witnesses almost certainly reveal his thinking about the substance of the case." *Id.* at 475-76. Judge Oetken concluded that "[i]t is impossible for DOJ to disclose the FD-302s without revealing protected information about . . . case analysis and strategy," and that "[a]s such, the FD-302s are exempt from disclosure under FOIA Exemption 5." *Id.* at 476.[7]

Finally, and just a few months ago, Judge Schofield of the Southern District of New York endorsed the Department's withholding of many of the very same interview records at issue in this case. *Am. Oversight v. U.S. Dep't of Justice*, 19-cv-8215, 2021 WL 964220 (S.D.N.Y. Mar. 15, 2021), *appeal filed*, No. 21-1266 (2d Cir. May 13, 2021). In that case, the plaintiff sought 27 interview records – which are also at issue here – including "twenty-one FBI Form 302s prepared by FBI Special Agents, three interview memoranda prepared by SDNY Special Agents, two sets of handwritten notes prepared by prosecutors and one set of handwritten notes prepared by an FBI

---

[6] The plaintiffs did not appeal the district court's determination that the FD-302s were properly withheld under Exemption 5 as attorney work product.

[7] Judge Oetken stated that "witness statements are sometimes but not always work product," and that the proper test was whether the statements "reveal an attorney's strategic impressions and mental processes." *N.Y. Times Co.*, 138 F. Supp. 3d at 472. However, the D.C. Circuit has rejected the argument that an agency may assert work product "*only* [as to]. . . text concerning the mental impressions, conclusions, opinions, or legal theories of an attorney" because the work product doctrine "also protects factual materials prepared in anticipation of litigation." *Tax Analysts*, 117 F.3d at 620; *see also Martin*, 819 F.2d at 1187 ("The work-product privilege simply does not distinguish between factual and deliberative material."). In any event, the distinction is irrelevant here, as revealing the interview records would reveal the prosecutors' legal strategy and mental impressions. *See infra*.

Special Agent." *Id.* at *1; *see* Griffin Decl. ¶ 23. Judge Schofield noted that an SDNY prosecutor provided a declaration indicating that each of these interview records "were prepared in anticipation of litigation, specifically for the prosecutors to evaluate whether criminal prosecutions were warranted." *Am. Oversight*, 2021 WL 964220, at *3. The declaration also noted that the interview records had been prepared by FBI or SDNY Special Agents "acting under the substantial direction of prosecutors and were reviewed by prosecutors," and that '[d]isclosure of the records would reveal prosecutors' selection of witnesses to interview, as well as their mental impressions, legal theories, case analysis, and strategic decisions regarding the investigation." *Id.* (quoting declaration). The declaration further stated that the records had not been disclosed in any judicial or administrative proceeding and had not "otherwise been publicly disclosed." *Id.* Accordingly, Judge Schofield held that "the DOJ has shown that the twenty-seven responsive interview records are protected from disclosure under Exemption 5 under the attorney work-product doctrine." *Id.*

### 2. The Interview Reports Were Properly Withheld Under Exemption 5 As Attorney Work Product

Just as in *Judicial Watch*, *Leopold*, *New York Times*, and *American Oversight*, the interview reports at issue here are all attorney work product and have been properly withheld in full or in part under Exemption 5. The responsive FD-302s, interview memoranda prepared by SDNY Special Agents, and handwritten notes associated with the witness interviews bear the same hallmarks that led other courts to recognize that these materials were prepared in anticipation of litigation and constitute attorney work product.[8] These records were generated as part of SDNY's investigations, *see* McKay Decl. ¶ 10, and the interviews that led to the creation of the records "were conducted and recorded to gather and assess the extent to which evidence could be obtained to support criminal charges and that could be presented to a grand jury or at trial," *id.* ¶ 15. Moreover, "[t]he prosecutors anticipated the potential for criminal charges during the investigation and

---

[8] Indeed, Judge Schofield in *American Oversight* already held that 27 interview records at issue here are protected by the attorney work product privilege. Griffin Decl. ¶ 23. Those 27 records are noted in the EOUSA index with the identifier "upheld in AO." *Id.* The Department's work product assertion with respect to one record was upheld in both *American Oversight* and a separate case. *See* Griffin Decl. ¶ 23.

at the time the witness interviews leading to the creation of interview reports . . . were conducted." *Id.* Thus, "[t]he reports and notes were generated . . . because of the prospect of litigation." *Id.*

Moreover, "[d]isclosure of the interview reports[ and] handwritten notes . . . would reveal the prosecutors' selection of witnesses to interview, as well as prosecutors' mental impressions, legal theories, case analysis, and strategic decisions regarding the investigation." *Id.* ¶ 16. AUSA McKay further notes that "none of the interview reports . . . identified on the EOUSA Index have been disclosed in connection with any judicial or administrative proceedings to any person outside of the government or have otherwise been publicly disclosed." *Id.* ¶ 18. Nor were they "shared with the respective witnesses or their counsel" or produced in criminal discovery, as "Cohen pleaded guilty . . . before any criminal discovery obligations were triggered." *Id.*

Although most of the interview reports were prepared by either FBI or SDNY Special Agents rather than attorneys, *see* McKay Decl. ¶ 12, that in no way changes the fact that these materials qualify as attorney work product. Courts have long recognized that the attorney work product doctrine extends to materials beyond those prepared by attorneys themselves. The Supreme Court has noted that "the doctrine is an intensely practical one, grounded in the realities of litigation," and that "[o]ne of those realities is that attorneys must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *Nobles*, 422 U.S. at 238. Accordingly, "[i]t is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* at 238-39; *see* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents . . . that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney . . . or agent).").

Here, although many of the interview records were prepared by non-attorneys, they still qualify as attorney work product because they were prepared under the overall direction of attorneys in anticipation of litigation. As AUSA McKay explains, "SDNY prosecutors selected the witnesses to interview, discussed and determined in advance the investigative strategy for witness interviews, and in most cases led the interviews." McKay Decl. ¶ 10; *see also id.* ¶ 15 ("Prosecutors

and/or Special Agents acting at the substantial direction of prosecutors conducted the witness interviews in connection with the prosecutors' evaluation of whether criminal prosecutions were warranted."). "For all but five of th[e] interviews, SDNY prosecutors conducted the questioning reflected in the interview reports and associated handwritten notes," and for these interviews the prosecutors also "selected which documents (if any) would be used during the interviews." *Id.* ¶ 16. For the remaining five interviews, while Special Agents conducted the questioning, prosecutors had "coordinated with the Special Agents in advance of the interviews and discussed with them the topics to be covered and certain questions to be asked." *Id.* ¶ 17.[9] Finally, the FD-302s and interview memoranda were reviewed by prosecutors. *Id.* ¶ 10. Accordingly, even though Special Agents prepared many of the FD-302s, interview memoranda, and handwritten notes, these agents were acting under the substantial direction of the prosecutors, and these interview records accordingly fall squarely within the scope of the attorney work product doctrine. Indeed, in several of the cases noted above the courts specifically held that FD-302s and other interview reports drafted by non-attorneys could constitute work product and those courts upheld the withholdings under Exemption 5. *See Judicial Watch*, 806 F. App'x at 7-8; *Am. Oversight*, 2021 WL 964220, at *4; *Leopold*, 487 F. Supp. 3d at 11-12.

## B. The Interview Reports Were Also Properly Withheld in Full or in Part Under Exemptions 6 and 7(C) To Protect Personal Privacy

Because the Department's withholdings of the interview records are justified under Exemption 5, there is no need for the Court to consider the Department's alternative withholdings. *See, e.g.*, *Am. Oversight*, 2021 WL 964220 at *4 (declining to consider privacy-related withholdings of FD-302s and other interview records after determining the records were attorney work product). But in any event the interview reports are also properly withheld in full or in part pursuant to Exemptions 6 and 7(C).

---

[9] In addition, for one of these Special Agent-led interviews, a prosecutor participated in the interview by phone. McKay Decl. ¶ 17.

Exemption 6 allows an agency to withhold information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For this exemption to apply, the information at issue must be maintained in a government file and apply to a particular individual. *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). Once this threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). As a threshold matter, for Exemption 7(C) to apply the records at issue must have been compiled for law enforcement purposes. *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008).

Once it has been determined that a record was compiled for law enforcement purposes, Exemption 7(C) – like Exemption 6 – requires individual privacy rights to be balanced against the public interest in disclosure. *See, e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989). However, courts have consistently held that Exemption 7(C) "is more protective of privacy than Exemption 6." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004) (comparing statutory language of Exemptions 6 and 7(C)). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *CREW v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) (hereinafter "*CREW I*")). Nonetheless, given the similarities between Exemptions 6 and 7(C), case law pertaining to one is often germane to the other. *See Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

The interview records at issue squarely meet the threshold requirements of both Exemption 6 and Exemption 7(C). They qualify as "similar files" under Exemption 6 because the protected

information applies to a particular individual and is contained in government records. *Washington Post*, 456 U.S. at 602. With respect to Exemption 7(C), the materials were also "compiled for law enforcement purposes" since they were prepared in the course of an active criminal law enforcement investigation. *See* McKay Decl. ¶ 15; Seidel Decl. ¶ 18; Griffin Decl. ¶ 40. Because, as discussed below, the privacy interests at stake in these documents outweigh the potential interest in disclosure, the Department's invocations of Exemptions 6 and 7(C) should be affirmed.

### 1. The Cooperating Witnesses and Third Parties Mentioned in the Interview Reports Have Compelling Privacy Interests in Avoiding Disclosure

The Department withheld information in the interview reports to protect the privacy of numerous individuals, including the cooperating witnesses, third parties of investigative interest mentioned in the interviews, and other third parties mentioned in the interviews. *See* McKay Decl. ¶ 21; Seidel Decl. ¶¶ 22-30; Griffin Decl. ¶¶ 42-45. The Department has produced redacted versions of the interview records for the four individuals who have publicly acknowledged that they provided interviews as part of the investigation, including Mr. Cohen.[10] *See* McKay Decl. ¶ 22; *see* Griffin Decl. ¶ 21. To the best of the government's knowledge, none of the other witnesses have acknowledged their cooperation with the government's investigation, and it is the SDNY's general practice not to acknowledge whether or not specific individuals have provided interviews or otherwise cooperated with an investigation. *See* McKay Decl. ¶¶ 22, 24. Aside from Mr. Cohen, none of the witnesses were charged with any crime related to the SDNY's investigations. *Id.* ¶¶ 7, 9.

In these circumstances, the Department properly withheld the interview records in full or in part pursuant to Exemptions 6 and 7(C). Courts have long recognized the enormous privacy interests at stake when an individual could be associated with a criminal investigation. *See, e.g.*, *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) ("In a number of cases,

---

[10] In general, the redacted interview reports reveal the names of witnesses and certain information about the interview (such as the date and location). The substance of the redacted interviews is generally redacted, although in one instance the Department released an excerpt of an FD-302 where the excerpted information had been publicly disclosed in the Mueller Report. Griffin Decl. ¶ 21.

this court has found that individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation."). That is so because "[i]t is surely beyond dispute that 'the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (quoting *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987)); *accord Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) ("A FOIA disclosure that would 'announce to the world that . . . certain individuals were targets of an FBI investigation,' albeit never prosecuted, may make those persons the subjects of rumor and innuendo, possibly resulting in serious damage to their reputations." (quoting *Fund for Const. Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 864 (D.C. Cir. 1981)).

For these reasons, the witnesses who have not publicly disclosed that they sat for interviews with prosecutors or investigators possess a strong interest in keeping their cooperation secret. Indeed, the D.C. Circuit has held that, absent narrow exceptions, names and identifying information of individuals appearing in law enforcement files are "categorically . . . exempt from disclosure." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991); *see Nation Magazine*, 71 F.3d at 896 ("[*SafeCard*] is one in a long line of FOIA cases holding that disclosure of the *identities* of private citizens mentioned in law enforcement files constitutes an unwarranted invasion of privacy and is thus exempt under 7(C)."). Although the *SafeCard* categorical rule does not apply for "individuals who have already been publicly identified – either through agency press releases or testimony in open court – as having been charged, convicted or otherwise implicated in connection with the . . . investigation," *CREW v. U.S. Dep't of Justice*, 854 F.3d 675, 682 (D.C. Cir. 2017) (hereinafter "*CREW II*"), even in those circumstances, courts recognize that these individuals retain substantial interests in avoiding the disclosure of additional facts regarding the nature of their involvement in the criminal investigation.[11] *See, e.g.*, *CREW I*, 746 F.3d at 1092 (noting that even

---

[11] Certain documents that the government filed in relation to Mr. Cohen's prosecution mention the names of some of the individuals who sat for interviews – thereby associating them with the criminal investigation – but those documents do not reveal, nor have the witnesses or the government disclosed, that the individuals cooperated with the investigation by providing an interview.

though the former Majority Leader of the U.S. House of Representatives had disclosed "the *fact* that he was under investigation," he nonetheless "retained a second, distinct privacy interest in the *contents* of the investigative files"); *Nova Oculus*, 486 F. Supp. 3d at 289 ("[T]he fact that the individuals' identities have been publicly connected with a law enforcement matter does not 'waive all [] interest in keeping the contents of the [investigative] file[s] confidential' because those individuals still have a 'privacy interest . . . in avoiding disclosure of the details of the investigation.'" (quoting *Kimberlin v. U.S. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998)).

Recognizing these well-established privacy interests, the Department properly withheld information contained in the interview records pursuant to Exemptions 6 and 7(C). In light of how much information is already publicly available about the investigation and prosecution of Mr. Cohen, nearly all of the individuals who sat for interviews would likely be identifiable if the interview records were released, even if the witnesses' names, addresses, and other personally identifying information were redacted. McKay Decl. ¶ 26 (explaining that about half of the witnesses would likely be identifiable by the general public, that all but one of the others likely would be identifiable by personal or business associates, and that the interview report of the final witness contains little substantive information about a lead that turned out to be a dead end). Moreover, releasing these records would tend to reveal the conduct that was of particular interest to prosecutors, which could expose "which individual(s) were the subject(s) of the investigations or otherwise of investigative interest." *Id.* ¶ 25. There are few privacy interests more substantial than the interest in keeping confidential the fact that someone who was never charged with a crime had been a subject of a criminal law enforcement investigation. *See, e.g.*, *Stern*, 737 F.2d at 92.

In addition to protecting the identities of the witnesses and persons of investigative interest, the Department also withheld information pursuant to Exemptions 6 and 7(C) in order to protect the privacy interests implicated by statements contained within the interview records. Records of

---

McKay Decl. ¶ 18 n.4; Griffin Decl. ¶ 43. For those individuals, the government does not contend the *SafeCard* categorical rule applies. But for the reasons stated herein, the balancing test still favors nondisclosure of information related to these individuals.

interviews conducted by prosecutors and investigators can contain a large amount of personal information, and these records are no exception. Griffin Decl. ¶ 42. Courts routinely recognize the privacy interests of all of these individuals, underscoring the weightiness of the privacy interests on one side of the balance.[12] *See Nation Magazine*, 71 F.3d at 894 ("[The] privacy interest also extends to third parties who may be mentioned in investigatory files, as well as to witnesses . . . who provided information during the course of an investigation.").

### 2. Disclosure of the Interview Records Would Provide Little Public Benefit

On the other side of the ledger, to overcome a privacy interest under Exemption 7(C), "a FOIA requester must (1) 'show that the public interest sought to be advanced [by disclosure] is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'" *Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007) (quoting *Favish*, 541 U.S. at 172). In its FOIA requests, Plaintiff contended that disclosure would serve the public interest in the following way:

> [T]he requested records would shed light on the extent, if any, that President Donald Trump or any of his businesses or associates has violated campaign finance laws and, if so, why the government has closed its investigation without prosecuting these crimes, with the exception of Michael Cohen. The American people deserve to know whether their president and his business associates have complied fully with the laws of our land and if they have not, why DOJ declined to prosecute them. The president is the most powerful and visible official of our country, and the truth about his actions and those of his campaign, businesses, and associates should not be shielded from public scrutiny.

EOUSA FOIA Request, Ex. B-2, at 2.

"The only relevant public interest in the FOIA balancing analysis," however, "is the extent to which disclosure of the information sought would shed light on an agency's performance of its

---

[12] Two interviews were undertaken to pursue a lead that turned out to be a dead end. McKay Decl. ¶ 27. Disclosure of the information in these interview records would be particularly invasive of the personal privacy of the witnesses and third parties mentioned in the document given that the information could not be verified or substantiated. *Id.*; *cf. Favish*, 541 U.S. at 166 ("Law enforcement documents obtained by Government investigators often contain information about persons interviewed as witnesses . . . whose link to the official inquiry may be the result of mere happenstance. There is special reason . . . to give protection to this intimate personal data[.]").

statutory duties or otherwise let citizens know what their government is up to." *CREW I*, 746 F.3d at 1093 (quoting *FLRA*, 510 U.S. at 497) (cleaned up). "That purpose . . . is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *FLRA*, 510 U.S. at 496. Accordingly, Plaintiff's interest in the activities of candidate Trump or his associates during the campaign are not relevant to the Exemption 6 and 7(C) balancing analysis; instead, the only relevant public interest is the extent to which disclosure would inform the public about *agency* activities. *See CREW I*, 746 F.3d at 1093 ("[T]he relevant public interest is *not* to find out what [House Majority Leader] DeLay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct.").

Thus, the only arguably cognizable public interest identified by Plaintiff is its suggestion that disclosure of the requested records would inform the public about why the Department declined to prosecute any individuals besides Mr. Cohen. *See* EOUSA FOIA Request, Ex. B-2, at 2. To be sure, the D.C. Circuit has recognized that disclosure of the contents of an investigative file, including FD-302s, could in some circumstances serve a public interest by informing the public about "the manner in which the DOJ carries out substantive law enforcement policy," including whether the government "pulled its punches." *CREW I*, 746 F.3d at 1093; *see also CREW II*, 854 F.3d at 682. But the D.C. Circuit also made clear that it was the FOIA requester's burden to demonstrate that disclosure would advance the public interest in disclosure. *CREW II*, 854 F.3d at 683.

Plaintiff cannot carry that burden. The records and information withheld under Exemptions 6 and 7(C) would not shed significant light on the operations or activities of DOJ or the FBI. *See* Seidel Decl. ¶¶ 25-26, 28; McKay Decl. ¶ 19; Griffin Decl. ¶ 44. Disclosure of the *identities* of who was interviewed would provide little insight into the conduct of the investigation or why the Department declined to prosecute additional individuals. *See, e.g.*, *FLRA*, 510 U.S. at 496. Nor would disclosure of the *contents* of the interview records be "likely to advance" Plaintiff's asserted public interest. *Favish*, 541 U.S. at 172. The interview records memorialize the interviews of witnesses; while they certainly reflect and reveal attorney work product and strategy, they do not

19

weigh evidence or contain prosecutors' reasoning as to whether or not to actually bring charges against any particular individual. McKay Decl. ¶ 19. Thus, factual information in the records would not shine any significant light on "why DOJ declined to prosecute" former President Donald Trump, or his businesses or associates. EOUSA FOIA Request, Ex. B-2, at 2.

Moreover, substantial information about the conduct of Mr. Cohen and others has been made publicly available in public filings in the criminal case. *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 178 (1991) (affirming withholding of information where "[t]he addition of the redacted identifying information would not shed any additional light on the Government's conduct" in light of other public disclosures). For example, the government has publicly disclosed Mr. Cohen's charging document, the transcript of his plea, the government's sentencing submission, as well as copies of search warrant applications, affidavits, and other documents relating to the search and seizure of Mr. Cohen's property. McKay Decl. ¶ 23. In light of the information that is already publicly available, Plaintiff cannot carry its burden to show that disclosure of the interview records would be likely to "significantly" advance the public's understanding of the government's conduct of the investigation. *FLRA*, 510 U.S. at 495.

### 3. The Balance Tips Strongly In Favor of Withholding the Interview Records

In this case, on one side of the balance lies the substantial privacy interests of witnesses who cooperated in a law enforcement investigation by providing interviews to investigators and prosecutors, and third parties mentioned in those interviews. Except for Mr. Cohen, none of these individuals were charged with a crime as a result of the investigations. McKay Decl. ¶¶ 7, 9. And aside from Mr. Cohen and three additional individuals, none of the witnesses have acknowledged their participation in the interviews. *Id.* ¶ 22. Precedent recognizes that such information contained in criminal investigatory records implicates some of the most profound privacy interests that can be threatened by disclosure of government records. *See, e.g.*, *Nation Magazine*, 71 F.3d at 893.

On the other side of the balance, Plaintiff cannot show that disclosure of the interview records would shed significant light on the only cognizable public interest identified by Plaintiff, *i.e.*, "why the government . . . closed its investigation without prosecuting" individuals besides Mr.

Cohen who might have committed crimes. Ex. B-2, at 2. The interview reports are not analytical documents weighing the law and evidence in order to determine whether it would be proper to file criminal charges; rather, the reports, if released, would provide only a snapshot of uncontextualized evidence. *See* McKay Decl. ¶ 19. While disclosure of such documents could certainly (and improperly) reveal attorneys' mental impressions and other work product, *see supra*, Plaintiff has not and cannot demonstrate that their disclosure would shine significant additional light on the conduct of the government's investigations, especially in light of the substantial information already available about the conduct of Mr. Cohen and his associates.

In these circumstances, the clear and weighty privacy interests of the cooperating witnesses and third parties easily outweigh the weak and speculative public interest in disclosure. Because the balance strongly weighs in favor of protecting the privacy interests of the cooperating witnesses and third parties, the Court should sustain the Department's withholdings under Exemptions 6 and 7(C) of information contained in the interview reports (if it reaches this issue).

## II.    The Department Properly Withheld Records Discussed in the Interviews

The Department's search located certain documents that were used or discussed in some of the interviews that generated the interview reports discussed above. *See* McKay Decl. ¶¶ 13, 18. Although these documents were shown to the witnesses, they were then collected before the end of the interview, and neither the witnesses nor their counsel were allowed to keep copies. *Id.* ¶ 18. Some of these records are no longer in dispute because they were obtained via grand jury subpoena and have been withheld pursuant to Exemption 3 and Federal Rule of Criminal Procedure 6(e). *See* Griffin Decl. ¶ 22 n.4. The records that remain at issue have been withheld in full because they are attorney work product and fall under Exemption 5, and many of these records also are withheld in full or in part pursuant to Exemptions 6 and 7(C). McKay Decl. ¶¶ 15, 21.

### A.  Documents Selected for Use in Interviews Constitute Attorney Work Product

Prosecutors selected the documents to be used during specific interviews, and production of the documents would reveal topics discussed during the interviews, the focus and emphasis of

21

the prosecutors, and their thinking about the substance of the case. McKay Decl. ¶ 16. Accordingly, these documents are protected by the attorney work product privilege for reasons similar to the interview reports discussed above.

Unlike the interview reports themselves, these documents were shown (temporarily) to the witnesses during the course of the interviews. McKay Decl. ¶ 18. While it is generally true that any disclosure of an attorney-client communication to a third party waives the *attorney-client* privilege, that is not the case for the work product privilege. *See In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982). That is so because the privileges serve different purposes, and a privilege is waived only "when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege." *Id.* Because the attorney-client privilege is meant to protect a confidential relationship, any disclosure to a third party is inconsistent with that privilege. *Id.* But the purpose of the work product privilege is not to protect a confidential relationship, "but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Accordingly, courts recognize that disclosure of work product does not waive the privilege when the disclosure is "not inconsistent" with the purposes of the doctrine. *See, e.g.*, *Sealed Case*, 676 F.2d at 818.

In determining whether disclosure of work product constitutes waiver, courts generally look to whether the disclosure was made in a way that is "inconsistent" with (1) the privilege's purpose of fostering effective trial preparation, and (2) maintaining secrecy against litigation adversaries. *See, e.g.*, *AT&T*, 642 F.2d at 1299 ("A disclosure made in the pursuit of [] trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege."). "What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances." *Nobles*, 422 U.S. at 239 n.14. Moreover, on multiple occasions the D.C. Circuit has noted that it has "allowed 'selective disclosure' of protected documents '*even in some circumstances to an adversary*' in formal litigation." *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 607 (D.C. Cir. 2001) (italics added) (quoting *In re*

*Sealed Case*, 676 F.2d at 818); *see also Williams & Connolly*, 662 F.3d at 1244 (again noting that disclosure to an adversary does not necessarily waive privilege).[13]

In the circumstances of this case, there is no reason to find waiver of the work product privilege. Most importantly, the SDNY's decision to show these documents to the cooperating witnesses was fully consistent with the fundamental purpose of the privilege: to encourage effective trial preparation. *Cf. AT&T*, 642 F.2d at 1300 (finding no waiver when "transfer is consistent with the promotion of trial preparation within the adversary system"). The SDNY prosecutors and investigators discussed these documents with cooperating witnesses as part of their investigation in order to gain a better understanding of the facts of the case, with the ultimate goal of helping the Department determine whether to bring criminal charges. McKay Decl. ¶ 20. That purpose is fully consistent with the goal of fostering effective trial preparation.

Moreover, as the purpose of the work product doctrine is "not to protect any interest of the attorney, but to protect the adversary trial process itself," *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980), waiver should generally be limited to circumstances where a party makes a selective disclosure of work product to gain an unfair litigation advantage. *Cf. Sealed Case*, 676 F.2d at 818 (noting waiver is appropriate when "tactics . . . degenerate into 'sharp practices' inimical to a healthy adversary system"). Similar reasoning played a role in *Rockwell*, where the plaintiff argued that FOIA required the disclosure of work product-protected documents that had been quoted in a public report at the center of a dispute between Congress and the Executive Branch. 235 F.3d at 601. The D.C. Circuit rejected the plaintiff's argument that work product had been waived after noting that in each of the cases cited by the plaintiff, disclosure had been "required . . . at least in part because their particular circumstances made doing so necessary to protect the adversary system." *Id.* at 606. Specifically, in the

---

[13] As noted above, SDNY does not disclose whether an uncharged individual was a subject or person of investigative interest. McKay Decl. ¶ 25. Accordingly, the Department does not say whether any of the witnesses shown documents qualify as an "adversary" within the meaning of the caselaw. But for the reasons discussed in this brief, even if these individuals were "adversaries," waiver would be inappropriate under the circumstances.

cases discussed by the *Rockwell* court, waiver was found when (1) a party allowed a witness to testify but then asserted work product to deny access to interview notes that the prosecutor was entitled to use in cross-examination (*Nobles*), (2) a company attempted to invoke work product in a way that would have threatened a criminal defendant's constitutional right to favorable evidence (*In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988)), and (3) a company disclosed work product to gain lenient treatment from the SEC as part of a voluntary disclosure program, but then sought to use the privilege to prevent the same documents from being disclosed to other litigation adversaries (*Sealed Case*). *See Rockwell*, 235 F.3d at 605-07. Finding no comparable conduct by the government, the *Rockwell* court held that work product had not been waived. *Id.* at 607. The same result should follow here. By discussing some documents with witnesses during the SDNY's investigation, the government did not seek a litigation advantage for which fairness requires a disclosure elsewhere to protect the health of the adversarial process. Accordingly, there is no waiver.

Nor is there any reason to find waiver on the ground that the government's actions were "inconsistent with the maintenance of secrecy from the disclosing party's adversary." *See Deloitte*, 610 F.3d at 140 (quoting *Rockwell*, 235 F.3d at 605).[14] Here the circumstances of this case are again very different from instances in which courts have found waiver of the work product privilege. Typically, in cases where courts found waiver, the receiving party was granted full access to the disclosed documents. *See, e.g.*, *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) (finding work product waived after company provided internal report and several binders of corporate records to the SEC); *cf. Judicial Watch v. U.S. Dep't of Def.*, 963 F.

---

[14] Although *Deloitte* at one point states that "the voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection," 610 F.3d at 140, that statement is best understood as a rule of thumb for the typical case, and cannot be read to mean that *every* such disclosure *always* waives work product protection. As noted above, the D.C. Circuit has on numerous occasions (including after *Deloitte*) stated that disclosure to an adversary does not necessarily waive the privilege. Moreover, nothing in *Deloitte* suggests that the D.C. Circuit meant to displace the general rule that a privilege is waived only when it is used in a way contrary to the purposes of the privilege.

24

Supp. 2d 6 (D.D.C. 2013) (declining to order production in Exemption 3 case when information sought had been shown to some non-government officials but not made widely available). By contrast, here the cooperating witnesses were only allowed to look at the documents during the interview, and then the documents were taken back at the end of the interview. McKay Decl. ¶ 18. In addition, with respect to the documents that remain in dispute because they were not covered by an unchallenged exemption, the prosecutors and investigators only showed witnesses records that were either publicly available or records that the prosecutors believed the witnesses were already aware of. McKay Decl. ¶ 20. Given that the records shown to witnesses were *already* available or known to them, it can hardly be said that the government was acting "inconsistent with the maintenance of secrecy" by discussing the documents with the cooperating witnesses.

Waiver is especially inappropriate here given the strong protection courts provide to documents connected with preparation of witness interviews. Indeed, in the foundational case on the work product doctrine, the Supreme Court even extended work product protection to documents shown to and *signed* by witnesses. *See Hickman*, 329 U.S. at 498, 508. Although the witnesses in *Hickman* were not specifically described by the Court as being adverse to the party represented by the lawyer, their status as potential adversaries is fairly inferred from the facts of the case: a tugboat sank and five of the nine crew members drowned, after which the owners of the tug hired a lawyer "to defend them against potential suits by representatives of the deceased crew members," and the lawyer received witness statements from the surviving crew members, who presumably could have raised a claim against the tug owners as well. *Id.* at 498.

Finally, the fact that this is a FOIA case – as opposed to a case in which a party adversary is seeking to compel production through discovery – further makes disclosure unwarranted. If the Department had ultimately prosecuted any of the witnesses, then the rules of criminal discovery might have given that witness a right to discover the documents at issue. But "[i]n criminal trials, evidentiary privileges may give way for any number of reasons," and the question in a *FOIA* case depends "on whether a document would usually be discoverable in a civil case." *Williams &*

*Connolly*, 662 F.3d at 1244-45. Here, there is no basis to conclude that the Department's decision to temporarily show cooperating witnesses certain documents during investigatory interviews would render those documents "routinely" or "normally" disclosable in a civil case, which is the relevant test under Exemption 5. *Rockwell*, 235 F.3d at 607.

### B.  Many of the Documents Are Also Subject to Exemptions 6 and 7(C)

Many of these records were also withheld in full or in part pursuant to Exemptions 6 and 7(C) to protect the personal privacy of the cooperating witnesses and third parties discussed in these records.[15] *See* McKay Decl. ¶ 21; Griffin Decl. ¶ 42. Specifically, the Department has withheld information in these records that would tend to disclose the identity of the individual who was being interviewed, identify third parties (including uncharged subjects of the investigation or other individuals of investigative interest), and/or reveal undisclosed personal information about third parties. McKay Decl. ¶ 28. For the same reasons as discussed above concerning the interview reports, these individuals have a strong privacy interest in avoiding disclosure of such information. *See supra*; *see also* Seidel Decl. ¶¶ 25-28. As these records comprise only the documents shown to some of the witnesses during the interviews, any cognizable public interest in their release would be even more attenuated than disclosure of the interview reports themselves. Plaintiff simply cannot show that disclosure of these materials would "significantly" advance the public's understanding of the government's investigation. *FLRA*, 510 U.S. at 495. That is particularly true given the amount of other information that is publicly available about the conduct of Mr. Cohen and others. *See* McKay Decl. ¶ 23. Thus, similar to the interview reports discussed above, the well-established privacy rights of the cooperating witnesses and third parties mentioned in these records easily outweigh the weak interest in disclosure, and the Court should accordingly affirm the Department's withholdings.

---

[15] These records, which were used or discussed in the interviews that led to the creation of the interview reports, meet the threshold requirements of Exemption 6 and 7(C) for similar reasons as the interview reports themselves. Griffin Decl. ¶¶ 39-40.

### III.    The Department Properly Withheld Materials Related to Search Warrants

The Department located certain records relating to search warrants that are responsive to Plaintiff's FOIA requests. Specifically, SDNY and the FBI located search warrant applications, supporting affidavits, executed search warrants, and additional FD-302s that document the execution of the search warrants. McKay Decl. ¶ 47. Although the government has previously released redacted documents that concern search warrants issued with regard to Mr. Cohen's property, *see id.* ¶¶ 23, 48, 52, the government has not acknowledged or disclosed the identities of any other individual whose property has been the subject of search warrants or other process in connection with the SDNY's investigation, *id.* ¶ 52.[16] The individuals whose property was seized pursuant to these search warrants were not charged as a result of the SDNY's investigation, and their identities have not been acknowledged or disclosed. *See id.* ¶¶ 7, 9, 52-53. The search warrant records that remain at issue meet the threshold requirements of Exemptions 6 and 7(C) for similar reasons as the interview records discussed above. *See supra.*

As discussed in the McKay Declaration, disclosure of the search warrant materials – even in redacted form – would likely lead to the public identification of the subjects of the search warrants. McKay Decl. ¶¶ 53, 55. As AUSA McKay explains, if the documents were released with redactions, the identities of the subjects of the search warrant would likely be apparent by comparing the documents together and alongside information that is already publicly available. *Id.* ¶ 55.

In light of this, the government properly withheld the search warrant records in full under Exemptions 6 and 7(C). As discussed in detail above, avoiding disclosure of unknown connections to a criminal investigation stands at the apex of protectable privacy interests under Exemptions 6 and 7(C). *See, e.g.*, *SafeCard*; 926 F.2d at 1206; *Nation Magazine*, 71 F.3d at 893; *Stern*, 737 F.2d at 92. Accordingly, all the reasons discussed above concerning why an individual has an interest

---

[16] One or more of the individual(s) subject to these search warrants have been mentioned in publicly disclosed government documents related to the investigations. However, neither the government nor the individual(s) have acknowledged or disclosed that the individual or individuals' property was seized pursuant to a search warrant. McKay Decl. ¶ 52 n.13; Griffin Decl. ¶ 43.

in avoiding disclosure of the fact they were interviewed by prosecutors or the FBI apply with equal force to individuals whose property was seized by federal investigators. Indeed, the privacy interests may be even more acute in the context of the search warrant documents. Since search warrants are issued by magistrates when there is probable cause to believe that a search will yield evidence or fruits of a crime, *see* Fed. R. Crim. P. 41(c)-(d), publicly revealing that an individual's property was the subject of a search warrant could lead the public to associate an individual with criminal activity in a particularly acute way, and here that could occur in the context of a high-profile matter. *See* Griffin Decl. ¶ 50; *Cf. Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987) ("There is little question that disclosing the identity of targets of law-enforcement investigations can lead to embarrassment and potentially more serious reputational harm."). Moreover, these individuals have a substantial privacy interest in avoiding public disclosure of the fact that the government seized their personal communications in connection with the government's investigations. McKay Decl. ¶ 56.

Turning to the other side of the balance, once again any cognizable public benefit in disclosure of these materials would be minimal. The government has already released redacted versions of search warrant materials relating to Mr. Cohen's property, and those materials contain an extensive discussion of Mr. Cohen's activities, including substantial discussion of the campaign finance scheme. *See* McKay Decl. ¶ 54. The search warrant records at issue were also executed to obtain evidence in furtherance of the campaign finance investigation. *Id.* ¶¶ 49-50. Given that substantial information is already available concerning the search of Mr. Cohen's property in the context of the campaign finance investigation, *see id.* ¶¶ 23, 54, Plaintiff cannot show that the additional disclosure of the other search warrant materials would meaningfully contribute to the public's understanding of the government's investigations. *See Ray*, 502 U.S. at 178 (considering other publicly available information when weighing public benefit of disclosure of additional documents). In light of this weak public interest and the fact that disclosure would tend to reveal the identities of individuals whose property was seized pursuant to search warrants during a high-

profile investigation, the balance strongly tips in favor of nondisclosure and the Department's withholdings should be upheld.

## IV. The Department Properly Withheld Internal Emails and Memoranda

Several components of the Department located responsive emails and memoranda that discuss various aspects of the campaign finance investigation and related investigation. For example, the Criminal Division identified emails and memoranda concerning SDNY requests for authorization to take certain investigative steps. Lavine Decl. ¶ 23. The Criminal Division also identified five "filter" memoranda that were referred to SDNY for processing, two of which remain at issue. McKay Decl. ¶ 30 & n.8; Lavine Decl. ¶ 35. In total, SDNY processed thirteen memoranda that remain at issue, which include the two Criminal Division filter memoranda, five records identified by SDNY that would arguably constitute responsive "prosecution memoranda," and six responsive emails and memoranda identified by OIP (and referred to SDNY). McKay Decl. ¶¶ 29-30. Eight of these records have been withheld in full, and five have been released in part. Griffin Decl. ¶ 24. These records fall into several discrete categories, which are each discussed in turn.

### A. The Criminal Division Records Were Properly Withheld Under Exemption 5 Pursuant to the Attorney Work Product and Deliberative Process Privileges

As part of their investigation and prosecution of Michael Cohen, SDNY prosecutors sought authorization to use certain tools and/or take certain investigative steps for which authorization may have been required, and accordingly requested permission from the appropriate office within the Department, the Office of Enforcement Operations ("OEO"). Lavine Decl. ¶ 23. The Department located 133 pages of emails and memoranda relating to the SDNY prosecutors' authorization requests, of which 108 pages were processed directly by the Criminal Division (the remaining 25 pages were referred to SDNY and are discussed below). *Id.* ¶ 18. After removing records that are no longer in dispute, the Criminal Division identified 61 pages that remain at issue ("the OEO records"). *See id.* ¶ 20. All of the OEO records have been properly withheld in full under Exemption 5 as attorney work product, *id.* ¶ 25, and many have also been withheld in full or in part under Exemption 5 because they are covered by the deliberative process privilege, *id.* ¶ 29.

As an initial matter, all of the OEO records meet the threshold requirements of Exemption 5. Specifically, the OEO records are communications exchanged within the Department of Justice, and therefore qualify as "intra-agency memorandums or letters" that fall under Exemption 5's threshold requirement. Lavine Decl. ¶ 21.

The OEO records were all properly withheld in full as attorney work product. As discussed above, "[t]he work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'" *Judicial Watch*, 926 F. Supp. 2d at 137 (quoting Fed. R. Civ. P. 26(b)(3)(A)). Here, there can be no question that the OEO records were all prepared in anticipation of litigation. The records were prepared by attorneys or at the direction of attorneys, *see* Lavine Decl. ¶ 25, and all relate to SDNY requests for authorization to use certain law enforcement tools or to take certain investigative steps, *see id.* ¶¶ 23-28. Moreover, the records contain discussions of the facts and evidence regarding the campaign finance investigation, legal analysis applying facts to the relevant regulations under which SDNY prosecutors sought authorization, and information reflecting the prosecutors' theory of the case and direction of the underlying investigation and potential litigation. *Id.* ¶¶ 26-27. In short, these records were prepared in anticipation of the prosecution of Michael Cohen and potentially others, *id.* ¶ 28, and accordingly were properly withheld in full under Exemption 5 as attorney work product.

Many of these records were also properly withheld in full or in part pursuant to the deliberative process privilege. *See* Lavine Decl. ¶¶ 29-35. The deliberative process "covers documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sourgoutsis v. U.S. Capitol Police*, 323 F.R.D. 100, 107 (D.D.C. 2017). To qualify for this privilege, documents must be both "predecisional" and "deliberative." "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786.

As discussed in the Lavine Declaration, the documents identified as deliberative in the Criminal Division's *Vaughn* index reflect predecisional discussions between and within the Criminal Division and SDNY concerning SDNY's request for authorization to take various investigative steps or to use certain law enforcement tools. Lavine Decl. ¶¶ 30-33. The records generally consist of (1) memoranda that either request this authorization or analyze these requests for authorization, *see id.* ¶ 30-31, or (2) emails discussing or commenting on those requests, *see id.* ¶ 32. The withheld portions of these records contain deliberative communications and analysis that occurred prior to a final decision being made about the requests. *See id.* ¶¶ 30-34. These records contain "opinions and recommendations regarding the sufficiency of the information provided to support the authorization requests," and also "include opinions, evaluations, and deliberations comprising the attorneys' legal analysis regarding the authorization requests." *Id.* ¶ 33. As explained in the Lavine Declaration, "[t]he information contained in the records contributed to the decision-making processes of both the Criminal Division . . . and the multiple components of DOJ with regard to the underlying investigation." *Id.* In short, "[t]he records at issue are part of the exchange that accompanies all decision-making and reflect the preliminary legal analysis of DOJ attorneys, which are ultimately submitted to senior officials for review." *Id.* Accordingly, the Department has properly withheld these records in full or in part pursuant to the deliberative process privilege.

### B.  The Filter Memoranda Were Properly Withheld Under Exemption 5 Pursuant to the Attorney Work Product and Deliberative Process Privileges

The two "filter" memoranda remaining at issue were prepared by SDNY as part of a process to ensure that investigators were not improperly exposed to certain protected information. *See* McKay Decl. ¶ 44; *see also id.* ¶ 30 & n.8; Lavine Decl. ¶ 35. Specifically, the SDNY's "investigative" team drafted these memoranda to be used by a separate "filter" team (or teams). McKay Decl. ¶ 44. The filter team(s) were "responsible for reviewing materials obtained via search warrants to identify, and filter out, any privileged or otherwise protected information." *Id.* The mem-

oranda contained background information about the case and the relevant individuals, and explained to the filter team what they were being asked to do. *Id.* Accordingly, the filter memoranda "were prepared in anticipation of the prosecution of Michael Cohen," *id.*, and therefore constitute attorney work product.

In addition, the filter memoranda are also protected by the deliberative process privilege. The memoranda were prepared and submitted to the Criminal Division as part of SDNY's request for authorization to take certain investigative steps. McKay Decl. ¶ 45. As AUSA McKay explains, the SDNY team understood that as part of that approval process, SDNY was required to submit appropriate filter memoranda, and that the Criminal Division would consider those memoranda as part of its process of determining whether to grant the requested authorization. *Id.*; *see also* Lavine Decl. ¶ 35 (noting that the Criminal Division, in deciding whether to authorize SDNY to take certain investigative steps, considered the filter memoranda in examining whether sufficient steps were being taken to ensure that privileged communications would not be provided to the investigative team). Accordingly, these memoranda are both predecisional and deliberative and protected by the deliberative process privilege. McKay Decl. ¶ 45; Lavine Dec. ¶ 35.

Because the filter memoranda are both attorney work product and are covered by the deliberative process privilege, the memoranda were properly withheld in full.

### C. The Prosecution Memoranda, Other Memoranda, And Related Emails Were Properly Withheld Under Exemption 5 Pursuant to the Attorney Work Product and Deliberative Process Privileges

The Department has also withheld, in full or in part, eleven additional emails and memoranda, as reflected on the SDNY's *Vaughn* index. The records that remain at issue in this category include five "prosecution memoranda" that were located by SDNY, and six emails (or email chains) and memoranda located by OIP. *See* McKay Decl. ¶¶ 29-30; Griffin Decl. ¶ 24. Each of these records were withheld, in full or in part, because they are protected under the attorney work product privilege and the deliberative process privilege. McKay Decl. ¶ 31. The eleven records broadly fall into three different categories, which are discussed in detail below. All of these records

meet the threshold requirements of Exemption 5 because they were exchanged within the Department of Justice and thus qualify as "intra-agency memorandums or letters." Griffin Decl. ¶ 26.

### 1. The March 30, 2018, August 9, 2018, and August 18, 2018 Prosecution Memoranda

According to AUSA McKay, these records are "classic prosecution memoranda" that discuss either potential or proposed charges against Michael Cohen. McKay Decl. ¶¶ 32-33. Specifically, the memoranda contain SDNY's analysis as to "whether or not the evidence available to prosecutors at the time of each memorandum is or may be sufficient to support specific criminal charges." *Id.* ¶ 33. The earliest memorandum (dated March 30) "was prepared for the principal purpose of determining whether [SDNY] had sufficient evidence to warrant the significant overt investigative step of conducting searches on premises and electronic devices possessed by Cohen." *Id.* The two later memoranda (dated August 9 and August 18) "contain recommendations as to which charges should be instituted." *Id.* Accordingly, all three memoranda constitute attorney work product because they "were prepared in anticipation of a potential prosecution." *Id.*

These records are also protected by the deliberative process privilege. Each memorandum "preceded the Deputy U.S. Attorney's determination to institute criminal charges against Cohen," and the March 30 memorandum also "preceded the decision to take overt investigative steps in the campaign finance investigation." McKay Decl. ¶ 34. The three memoranda are also deliberative because "they consider and evaluate whether or not the available evidence justifies the institution of criminal charges and/or the taking of specific investigative steps," and they "formed an important part of the consultative process of deciding whether to institute campaign finance charges against Cohen, and in the case of the March 30, 2018 memorandum, whether to proceed to seek search warrants for Cohen's property." *Id.*; *see also* Ziese Decl. ¶ 15 (describing August 18 memorandum's role in deliberations of senior Departmental officials). Because the memoranda are predecisional and deliberative, they are protected by the deliberative process privilege.

Accordingly, these records were properly withheld in full under Exemption 5.

## 2. The November 29, 2018 Email and December 15, 2018 Memorandum and Related Email

In approximately late November, 2018, the Office of the Deputy Attorney General ("ODAG") requested that SDNY provide a list of certain open investigations and their current status and anticipated investigative steps. McKay Decl. ¶ 36; Ziese Decl. ¶ 17. That request led to the creation of the next set of records at issue: an email dated November 29, 2018, a memorandum dated December 15, 2018, and an email exchange that occurred on December 15, 2018. *See* McKay Decl. ¶¶ 35-40.

In response to ODAG's request, the Deputy U.S. Attorney and the prosecution team prepared the list contained in the November 29, 2018 email. McKay Decl. ¶ 35. This list identified five then-pending investigations, including the campaign finance investigation and the related investigation.[17] *Id.* ¶ 36. For each item in the list, the email provides a description of the investigation, its status, and anticipated investigative steps. *Id.*

Sometime after receiving the November 29, 2018 email, ODAG asked SDNY to prepare memoranda addressing certain SDNY investigations. *Id.* ¶ 37. This request led to the creation of the December 15, 2018 memorandum. *Id.* That memo was also prepared by the Deputy U.S. Attorney and the prosecution team, *id.* ¶ 35, and it discusses four then-pending SDNY investigations, including the campaign finance and related investigations. *Id.* ¶ 38.

The November 29, 2018 email and the December 15, 2018 memorandum constitute attorney work product because they were "prepared by attorneys in anticipation of litigation, specifically, the potential prosecution of individuals other than Michael Cohen for campaign finance violations or for making false statements, giving false testimony, or otherwise obstructing justice in connection with the campaign finance investigation." *Id.* ¶ 39. ODAG directly supervises the

---

[17] Both the November 29, 2018 email and the December 15, 2018 memorandum contain sections that discuss other investigations that are not responsive to Plaintiff's FOIA request. *See* McKay Decl. ¶ 35 n.10. The parties have agreed that Defendant need not process segregable, non-responsive sections of memos that are about entirely different topics than those responsive to Plaintiff's FOIA requests. In addition, portions of these records have been withheld pursuant to Exemption 3 and Federal Rule of Criminal Procedure 6(e), and they therefore are no longer at issue. *See* ECF No. 21, at 1.

ninety-three United States Attorneys and the Department's law enforcement agencies and has the authority to weigh in on contemplated prosecutive decisions. Ziese Decl. ¶ 12. When Department components provide information to ODAG about pending or proposed Department actions, that exchange is part of a process that allows ODAG to determine whether and how to exercise its supervisory functions over Department activities, including whether to endorse, modify, or reject the contemplated actions. *See id.* ¶¶ 12-13. This is particularly true when the exchange of information concerns actions that are important, sensitive, or high-profile, as is the case for the investigations at issue here. *See id.* ¶¶ 12-15. Accordingly, SDNY's response to ODAG's request for information was prepared in anticipation of litigation and therefore constitutes attorney work product.

The November 29, 2018 email and the December 15, 2018 memorandum are also predecisional and deliberative, and therefore protected by the deliberative process privilege. These records were provided to senior officials to provide insight into several sensitive ongoing investigations. Ziese Decl. ¶ 17; McKay Decl. ¶ 40. As explained in the Ziese Declaration, when information is given to senior officials such as those in ODAG about sensitive Department activities, that exchange of information is part of a deliberative process in which senior Department leaders may exercise their supervisory capacity to endorse, modify, or reject the contemplated actions of other Department officials. *See* Ziese Decl. ¶¶ 11-14, 17. In responding to ODAG's request for information about sensitive investigations, SDNY was participating in a deliberative process in which ODAG was gathering information to prepare for upcoming meetings, knowing that decisions could be taken by DOJ senior leadership concerning the matters discussed in those meetings. *See id.* ¶ 17.

Because the December 15, 2018 memorandum is entirely protected by the attorney work product and deliberative process privileges, the Department appropriately withheld it in full under Exemption 5. The redacted portions of the November 29, 2018 email have been appropriately withheld pursuant to the same privileges.

The last record at issue in this set is a December 15, 2018 email chain that attaches and forwards the December 15 memorandum. This email chain has been released in part, with a small redaction of material that is both deliberative and attorney work product. The withheld portion of this email was prepared by prosecutors in anticipation of the potential prosecutions addressed in the memoranda attached to the email, and the withheld portion also discusses the nature of a request by senior Department leaders for information regarding the status of pending and sensitive investigations. McKay Decl. ¶¶ 39-40; Ziese Decl. ¶ 17.

### 3.    The February 22, 2019 and March 1, 2019 Memoranda and Related Emails

In late February 2019, the Deputy U.S. Attorney for SDNY met with then-Attorney General Barr, who had recently taken office. McKay Decl. ¶ 41; *see* Ziese Decl. ¶ 18 & n.2. The Deputy U.S. Attorney and the prosecution team, at the request of the Attorney General or his staff, prepared the February 22, 2019 Memorandum in advance of that meeting and provided it to senior Department leadership in advance of the meeting. McKay Decl. ¶ 41. That memorandum summarized certain sensitive, then-pending investigations being conducted by SDNY, including the related investigation, in order to brief the Attorney General about these investigations in preparation for the meeting. *Id.*; Ziese Decl. ¶ 18. The March 1, 2019 Memorandum was prepared to provide additional information and to respond to questions asked by the Attorney General at the late February meeting. McKay Decl. ¶ 41; Ziese Decl. ¶ 18.

These memoranda constitute attorney work product. The responsive portions of the February 22 memorandum and the March 1 memorandum were prepared in anticipation of the potential prosecution of one or more individuals for making false statements, giving false testimony, or otherwise obstructing justice. McKay Decl. ¶ 42. In addition, the March 1 memorandum was also prepared in anticipation of potential litigation related to the campaign finance investigation and prosecution of Mr. Cohen. *Id.* Because the memoranda were provided to officials within the offices of the Attorney General and Deputy Attorney General, these records were also subject to an understanding that senior Department leadership might exercise their supervisory authority to make

decisions relevant to the conduct of the sensitive investigations at issue. *See* Ziese Decl. ¶¶ 11-14, 18.

The memoranda are also protected by the deliberative process privilege. The February 22 memorandum was prepared to brief the Attorney General about the status of, and contemplated investigative steps, in certain pending SDNY investigations in advance of a meeting between the Attorney General and the Deputy U.S. Attorney. McKay Decl. ¶ 43. The March 1 memorandum was prepared to respond to the Attorney General's request for additional information and to re-spond to questions asked in the late February meeting. *Id.* Both memoranda were prepared at the request of the Attorney General or his staff to facilitate the Attorney General's deliberations and decisions with regard to the campaign finance investigation and the related investigation. *Id.*; *see* Ziese Decl. ¶¶ 19-20.

Emails attaching and discussing the February 22, 2019 and March 1, 2019 memoranda have been produced with redactions. One email chain, spanning February 22 to February 24, 2019 and attaching the February 22, 2019 memorandum, has been produced with a small redaction of information protected by Exemption 5 and the attorney work product and deliberative process privileges because it was prepared in anticipation of litigation and would identify an additional topic about which Department leadership solicited information.[18] Ziese Decl. ¶ 21. The other email chain, spanning March 1 to March 2, 2019, contains a small amount of redacted text that has been withheld pursuant to the attorney work product and deliberative process privileges because the redacted information was drafted in anticipation of litigation, identifies aspects of the fully privi-leged March 1, 2019 memorandum, and would reveal deliberative information relating to the March 1, 2019 memorandum. Ziese Decl. ¶ 22; *see* McKay Decl. ¶¶ 42-43.

---

[18] The Department also redacted the names of non-responsive attachments to the email pursuant to the parties' agreement that segregable, non-responsive sections contained in memoranda need not be processed. Ziese Decl. ¶ 21.

**D.  The Emails and Memoranda Are Subject to Other Partial Withholdings**

Most of the emails and memoranda discussed above are also subject to partial withholdings pursuant to Exemptions 6 and 7(C) to protect the personal privacy of subjects of investigative interest and third parties mentioned in the relevant materials. Griffin Decl. ¶¶ 47-49; McKay Decl. ¶ 46. For reasons similar to those discussed in detail *supra*, disclosure of identifying information or other personal information of these individuals would result in an unwarranted invasion of personal privacy. *See* McKay Decl. ¶ 46; Lavine Decl. ¶¶ 43-44; Griffin Decl. ¶¶ 47-50.

**V.    Disclosure of the Withheld Information Would Harm Interests Protected by FOIA Exemptions**

Under the FOIA Improvement Act of 2016, in order to justify the withholding of a responsive record, the government must show that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) [of FOIA]," or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *see Reporters' Comm. for Freedom of the Press v. FBI*, --- F.4th ---, 2021 WL 2753938, at *11-12 (D.C. Cir. July 2, 2021) (discussing foreseeable harm standard). The legislative history of this amendment acknowledges that the provision "does not alter the scope of information that is covered under an exemption." H.R. Rep. No. 114-391, at 10 (2016). Indeed, the amendment codified existing government policy that had been in place for years. *See id.* at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4, at 8 (same); Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum). And the Department already employed this standard when defending agency withholdings in litigation. *See* H.R. Rep. No. 114-391, at 9; *accord* Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the Freedom of Information Act, at 1-2 (Mar. 19, 2009), *available at* http://www.usdoj.gov/ag/foia/memo-march2009.pdf. As recently described by the D.C. Circuit, to satisfy the foreseeable harm requirement, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reporters' Comm.*, 2021 WL 2753938 at *11.

Foreseeable harm analysis first requires identification of the interests protected by the relevant FOIA exemptions. The attorney work product doctrine, available under Exemption 5, aims to "protect the adversary trial process itself" as "the integrity of our system would suffer if adversaries were entitled to probe each other's thoughts and plans concerning the case." *Rockwell*, 235 F.3d at 604-05 (quoting *Coastal States*, 617 F.2d at 864). The deliberative process privilege – also available through Exemption 5 – aims to "protect[] the public from the confusion that would result from premature exposure to discussions occurring before" a final decision has been made. *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quoting *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772-73 (D.C. Cir. 1978)). The deliberative process privilege also "prevent[s] injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). The Department's declarations explain how disclosure of the information at issue would foreseeably harm these interests.

Disclosure of the interview reports would harm an interest protected by Exemption 5 and the attorney work product privilege. The entire purpose of the work product privilege is to allow a lawyer "a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman*, 329 U.S. at 510. The Supreme Court recognized this protection is "essential to an orderly working of our system of legal procedure," *id.* at 512, because "[p]roper preparation of a client's case demands that [the lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference," *id.* at 511.

As the Department's declarations explain, disclosure of the interview reports would reveal the prosecutors' mental impressions and legal theories of the case, as well as the prosecutors' strategic decisions about who to interview, what topics to cover (and not cover), and what to focus on with each witness. *See* McKay Decl. ¶¶ 16-17; *see also* Griffin Decl. ¶ 34. These are precisely the types of revelations that the Supreme Court in *Hickman* recognized as needing the protection of the work product doctrine. More recently, the D.C. Circuit noted that the purpose of the attorney

39

work product doctrine was to "promote[] the adversary process by insulating an attorney's litigation preparation from discovery." *Deloitte*, 610 F.3d at 139-40. If material that clearly constitutes work product – such as the FD-302s, interview memoranda, and handwritten notes at issue here – could be requested by any person through FOIA, then such a framework would deprive government attorneys (and only government attorneys) of the "degree of privacy" and freedom from "undue and needless interference" that courts have long recognized as critical to the orderly conduct of litigation. The government attorney would be put in a fishbowl, constantly wondering whether documents created while anticipating litigation could be disclosed through FOIA, even when the same material would undoubtedly be protected if prepared by a private lawyer.

Disclosure would also eliminate the Department's ability to assert a discovery privilege over the interview reports if these records were sought in future civil litigation, causing another harm protected by an exemption. Griffin Decl. ¶ 34. Consider, for example, a situation where a future litigant sues the government and issues a discovery request for which one of the FD-302s is responsive. In party discovery, the government could resist disclosing the document because of its status as work product. But that privilege would be meaningless if the litigant (or Plaintiff here) could simply demand the document through FOIA. *See Martin*, 819 F.2d at 1186 (rejecting understanding of work product doctrine that would "effectively allow[] FOIA to be used as a supplement to civil discovery"). Accordingly, allowing the disclosure of the interview reports would cause a foreseeable harm in that it would effectively deny the government the ability to make a viable privilege assertion against adversaries in future civil litigation. *Cf. AT&T*, 642 F.2d at 1299 ("The purpose of the work product doctrine is to protect information against opposing parties[.]").

In addition, disclosure of the interview reports could harm the ability of prosecutors to pursue future investigations. *See Fund for Const'l Gov't v. Nat'l Archives & Records Serv.*, 485 F. Supp. 1, 14 (D.D.C. 1978) ("[D]isclosure of information generated during a prosecutor's assessment of particular cases would be extremely detrimental to the prosecutor's free exercise of discretion."); *see also Grolier*, 462 U.S. at 30 (Brennan J., concurring in part and concurring in the

judgment) ("It would be of substantial benefit to an opposing party (and of corresponding detriment to an agency) if the party could obtain work product generated by the agency in connection with earlier, similar litigation against other persons."). The SDNY's investigations encompassed a range of potential criminal violations, including campaign finance violations, bank fraud, tax evasion, obstruction of justice, false statements, and perjury. Griffin Decl. ¶ 34; *see* McKay Decl. ¶¶ 6-9. As these types of criminal investigations occur frequently in U.S. Attorneys' Offices throughout the country, publicly releasing the contents of the interview reports could inhibit the flexibility with which future prosecutors might structure and pursue similar investigations. Griffin Decl. ¶ 34. *See Leopold*, 487 F. Supp. 3d at 10 n.4 (rejecting Plaintiff's foreseeable harm argument in light of the Department's declaration stating that "disclosing the contents of the FD-302s at issue here would [] indirectly reveal the mental impressions, assessments, and thought processes of the attorneys involved in the investigation and of the Special Counsel in particular, contrary to the purpose of the attorney work product doctrine").

Likewise, disclosure of the various emails and memoranda that constitute attorney work product would harm an interest protected by that doctrine and Exemption 5. For example, disclosure of the OEO records would reveal attorneys' assessments of facts and issues pertaining to the authorization requests and attorneys' mental impressions and evaluation of evidence pertaining to the underlying investigation, among other sensitive topics. Lavine Decl. ¶ 26. Similarly, the filter memorandum contains background information about the case that was prepared by the SDNY investigative team and instructs the filter team how to perform an important part of the SDNY's investigation. *See* McKay Decl. ¶ 44; Griffin Decl. ¶ 38. The prosecution memoranda contain prosecutors' analysis concerning whether the evidence gathered in this case would be sufficient to support specific criminal charges. McKay Decl. ¶ 33; Griffin Decl. ¶ 36. Finally, the other memoranda and emails involve SDNY providing information about contemplated litigation to senior Department leaders who are charged with supervisory authority over SDNY's prosecutive decisions. *See* Ziese Decl. ¶¶ 11-23; Griffin Decl. ¶ 37; *see also Reporters' Comm.*, 2021 WL 2753938

at *14 (noting highly sensitive nature of government deliberations in finding "manifest" foreseeable harm).

Each of the above categories of documents were prepared in anticipation of litigation. If such materials were subject to disclosure under FOIA, it would foreclose the opportunity to assert a viable privilege assertion in future civil litigation, as well as preventing Department lawyers from enjoying the traditional protection afforded to lawyers to allow them to diligently oversee litigation without undue interference. *See* Griffin Decl. ¶¶ 35-38; Lavine Decl. ¶¶ 25, 36-39; *see Hickman*, 329 U.S. at 510 ("In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.").

Disclosure of any of the deliberative records would also harm an interest protected by Exemption 5. For example, disclosure of deliberative material concerning the OEO records and filter memoranda "would have a chilling effect on DOJ attorneys, who would no longer be comfortable documenting their legal strategies and recommendations." Lavine Decl. ¶ 37. Release of the preliminary assessments and opinions contained in the OEO records could make Criminal Division personnel "more circumspect in their discussions with each other," and make them "no longer feel free to discuss their ideas and advice in email messages," which would "degrade the quality of agency decisions" and "impair the Department's ability to foster the forthright, internal discussions necessary for efficient and proper decision making." *Id.*; *see generally id.* ¶¶ 36-39 (describing foreseeable harm).

Likewise, revealing materials such as the emails and memoranda exchanged between SDNY and senior Department leadership would harm the quality of the Department's deliberations. These records involve discussions among SDNY and the most senior leaders of the Department, including the Attorney General, the Deputy Attorney General, and their staffs. *See* Ziese Decl. ¶¶ 11-23. The records concern the oversight of particularly sensitive Department investigations and prosecutions. *See id.* Specifically, these records include discussions of proposed and contemplated charges (McKay Decl. ¶¶ 32-34), updates regarding the status of sensitive investi-

gations specifically asked about by ODAG (*id.* ¶¶ 35-38), and updates regarding the status of sensitive investigations and prosecutions and responses to follow-up questions by the Attorney General (*id.* ¶¶ 41-43). Given the highly sensitive nature of these records and the senior level of the decisionmakers involved, it is no surprise that the Department concluded that disclosure of the records "would hinder Department staff's ability to provide candid evaluations of topics for Department leadership," which would in turn hinder "Department leadership's ability to . . . make executive decisions regarding sensitive investigations of Departmental interest." Ziese Decl. ¶ 23. These concerns are of particular importance in the context of this case, since "the deliberations at issue touch on some of the most sensitive investigations and prosecutions of the Department, and involve the highest levels of Department leadership." *Id.*; *see Reporters' Comm.*, 2021 WL 2753938 at *14 (considering the sensitivity of deliberations and the senior level of the decisionmakers in finding that the record supported a finding of foreseeable harm). Moreover, and similar to the concerns expressed by the Criminal Division, the Ziese Declaration warns that if these deliberative materials were released for public consumption, Executive Branch personnel "would be more circumspect in expressing the necessary information to decision-makers who utilize and rely on such material, foreseeably and adversely impacting the quality of decision-making." Ziese Decl. ¶ 23; *see also* Griffin Decl. ¶¶ 35-38.

## VI.    The Department Released All Reasonably Segregable, Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such records after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with non-exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). But this provision does not require disclosure of records in which the non-exempt information that remains is meaningless. *See Nat'l Sec. Archive Fund,*

*Inc. v. CIA*, 402 F. Supp. 2d 211, 221 (D.D.C. 2005). And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008).

The Department's declarations establish that it has complied with its obligation to produce reasonably segregable, non-exempt information. *See* Lavine Decl. ¶ 49; Griffin Decl. ¶¶ 51-58. With respect to the interview reports, the Department has released portions of those records that identify witnesses who have publicly disclosed that they participated in interviews, but the remainder of these records have properly been withheld as work product. Griffin Decl. ¶ 54; *see Judicial Watch*, 806 F. App'x at 7 ("We also affirm the district court's conclusion that, because the 'entire contents of the [FD-302s] at issue here constitute attorney work product . . . there is no segregable information.'"). Similarly, the documents used in interviews, the OEO records, the filter memoranda, and the various other memoranda have all properly been withheld in full pursuant to the attorney work product privilege. *See Nat'l Ass'n of Criminal Def. Lawyers*, 844 F.3d at 256  (noting that when material is fully protected as work product, "the entire record is exempt from disclosure" and "there are no non-exempt portions left to segregate," except in circumstances not applicable here). With respect to the emails that were produced in part, with redactions made for attorney work product, deliberative material, and personal privacy, the Department's declarations state that all segregable, non-exempt material has been produced. *See* Griffin Decl. ¶ 51; Lavine Decl. ¶ 49.

As for the search warrant materials, AUSA McKay explained in detail that even if the documents were released in redacted form, with the names, addresses, and other identifying information redacted, that could lead to the unwarranted disclosure of the identities of the individuals who were the subjects of the search warrant. McKay Decl. ¶ 55. Accordingly, the Department complied with its obligation to release all segregable, non-exempt information.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment.

DATED: July 30, 2021                    Respectfully submitted,


                                        BRIAN D. NETTER
                                        Deputy Assistant Attorney General

                                        MARCIA BERMAN
                                        Assistant Branch Director

                                        /s/ Joshua C. Abbuhl
                                        JOSHUA C. ABBUHL
                                        D.C. Bar No. 1044782
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Washington, D.C. 20005
                                        Telephone: (202) 616-8366
                                        Facsimile: (202) 616-8470
                                        joshua.abbuhl@usdoj.gov
                                        *Counsel for Defendants*