# EXHIBIT A-9



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 20, 2018

Charles A. Stillman, Esq.
James A. Mitchell, Esq.
Ballard Spahr LLP

Re: American Media, Inc.

Dear Messrs. Stillman and Mitchell:

Based on the cooperation and implementation of remedial measures described below, and strictly subject to the terms, conditions, and understandings set forth herein, the Office of the United States Attorney for the Southern District of New York ("this Office") will not criminally prosecute American Media, Inc. ("AMI") for any crimes (except for criminal tax violations, if any, as to which this Office cannot and does not make any agreement) related to its participation, between in or about August 2015 up to and including in or about October 2016, in making a contribution and expenditure, aggregating $25,000 and more during the 2016 calendar year, to the campaign of a candidate for President of the United States, to the extent AMI has disclosed such participation to this Office as of the date of this Agreement. This conduct is described more fully in the Statement of Facts, which is attached hereto as Exhibit A, and incorporated by reference herein. AMI accepts and acknowledges as true the facts set forth in the Statement of Facts. Counsel for AMI hereby represents and warrants that the Board of Directors has authorized counsel to enter into this Agreement.

Moreover, if AMI fully complies with the understandings specified in this Agreement, no testimony or other information given by it (or any other information directly or indirectly derived therefrom) will be used against it in any criminal tax prosecution. This Agreement does not provide any protection against prosecution for any crimes except as set forth above.

It is understood that AMI (a) shall truthfully and completely disclose all information with respect to the activities of itself and its officers, agents and employees concerning all matters about which this Office inquires of it, which information can be used for any purpose; (b) shall cooperate fully with this Office and any other law enforcement agency designated by this Office; (c) shall attend all meetings at which this Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past and current officers, agents, or employees at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) shall provide to this Office upon request, any document, record, or other tangible evidence relating to matters about which this Office or any designated law enforcement agency inquires of it; and (e) shall commit no crimes whatsoever. Moreover, any assistance AMI may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators. AMI's obligations under this paragraph will continue

until the later of (1) a period of three years from the signing of this Agreement, or (2) the date on which all prosecutions arising out of the conduct described in the opening paragraph of this Agreement are final.

It is understood that, should AMI commit any crimes subsequent to the date of signing of this Agreement, or should the Government determine that AMI or its representatives have knowingly given false, incomplete, or misleading testimony or information, or should AMI otherwise violate any provision of this Agreement, AMI shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against AMI, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is understood that if the Government has determined that AMI has committed any crime after signing this Agreement or that AMI or its representatives have given false, incomplete, or misleading testimony or information, or that AMI has otherwise violated any provision of this Agreement, (a) all statements made by AMI or its representatives to this Office or other designated law enforcement agents, and any testimony given by AMI or its representatives before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against AMI; and (b) AMI shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

It is further understood that AMI shall (a) prepare and distribute, within three months of the signing of this agreement, to AMI's executive officers, senior management and editorial employees of a set of written standards regarding federal election laws and their application to AMI's media operations (the "Standards"); (b) conduct annual training concerning the Standards, with required attendance by AMI's executive officers, senior management and editorial employees; (c) employ, retain, or designate counsel knowledgeable in the field of federal election law as applied to AMI's business, which counsel shall be made available to all AMI employees to discuss any questions or concerns with respect to the Standards; (d) consult with counsel to ensure that any payments to acquire stories involving individuals running for office comply with the Standards; and (e) report to this Office any violation of the Standards or federal election law by AMI, it employees, or its representatives during the period of this agreement.

It is further understood that this Agreement does not bind any federal, state or local prosecuting authority other than this Office. This Office will, however, bring the cooperation of AMI to the attention of other prosecuting offices, if requested by AMI.

It is further understood that neither AMI nor this Office will disclose this Agreement and Exhibit A attached hereto to the public on or before November 6, 2018. Nothing in the foregoing

sentence is intended to preclude AMI from making this Agreement available, on a confidential basis, for review by counsel for AMI's underwriters, auditors or insurers for the limited purpose of negotiations regarding credit decisions. Counsel for AMI agrees that they will obtain a signed acknowledgment of confidentiality executed by any underwriter, auditor or insurer who reviews the Agreement.

With respect to this matter, this Agreement supersedes all prior, if any, understandings, promises and/or conditions between this Office and AMI. No additional promises, agreements, and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

Very truly yours,

ROBERT KHUZAMI
Acting United States Attorney

By: ______________________
Andrea Griswold
Rachel Maimin
Thomas McKay
Nicolas Roos
Assistant United States Attorneys
(212) 637-2268

APPROVED:

Lisa Zornberg
LISA ZORNBERG
Chief, Criminal Division

AGREED AND CONSENTED TO:

______________________
Eric Klee
General Counsel, AMI

September 21, 2018
Date

APPROVED:

______________________
Charles A. Stillman, Esq.
James A. Mitchell, Esq.
Attorneys for AMI

Date Sept 21, 2018

**Exhibit A to Letter to American Media, Inc., dated September 20, 2018**

**Statement of Admitted Facts**

1. American Media, Inc. ("AMI") is a corporation based in New York. AMI owns and publishes magazines, supermarket tabloids, and books, including the *National Enquirer*, *OK! Magazine*, *Star Magazine*, *Radar Online*, *Men's Journal*, and *Muscle & Fitness Her's*.

2. As set forth in more detail below, on or about August 10, 2016, AMI made a payment in the amount of $150,000, in cooperation, consultation, and concert with, and at the request and suggestion of one or more members or agents of a candidate's 2016 presidential campaign, to ensure that a woman did not publicize damaging allegations about that candidate before the 2016 presidential election and thereby influence that election.

3. In or about August 2015, David Pecker, the Chairman and Chief Executive Officer of AMI, met with Michael Cohen, an attorney for a presidential candidate, and at least one other member of the campaign. At the meeting, Pecker offered to help deal with negative stories about that presidential candidate's relationships with women by, among other things, assisting the campaign in identifying such stories so they could be purchased and their publication avoided. Pecker agreed to keep Cohen apprised of any such negative stories.

4. In or about June 2016, an attorney representing a model and actress attempting to sell her story of her alleged extramarital affair with the aforementioned presidential candidate contacted an editor at the *National Enquirer*. Pecker and the editor called Cohen and informed him of the story. At Cohen's urging and subject to Cohen's promise that AMI would be reimbursed, the editor began negotiating for the purchase of the story. On June 20, 2016, the editor interviewed the model about her story. Following the interview, AMI communicated to Cohen that it would acquire the story to prevent its publication.

5. On or about August 5, 2016, AMI entered into an agreement with the model to acquire her "limited life rights" to the story of her relationship with "any then-married man," in exchange for $150,000. It was also agreed that AMI would feature her on two magazine covers and could publish over one hundred magazine articles authored by her. AMI agreed to pay the model $150,000 – substantially more money than AMI otherwise would have paid to acquire the story – because of Cohen's assurances to Pecker that AMI would ultimately be reimbursed for the payment. Despite the cover and article features to the agreement, AMI's principal purpose in entering into the agreement was to suppress the model's story so as to prevent it from influencing the election. At no time during the negotiation for or acquisition of the model's story did AMI intend to publish the story or disseminate information about it publicly. On or about August 10, 2016, AMI sent $150,000 to an attorney representing the model.

6. Between in or about late August 2016 and September 2016, Cohen called Pecker and stated that he wanted to be assigned the limited life rights portion of AMI's agreement with the model, which included the requirement that the model not otherwise disclose her story. Pecker agreed to assign the rights to Cohen for $125,000. Pecker instructed a consultant who works for AMI to complete the assignment through a company unaffiliated with AMI. On September 30,

2016, Pecker signed an assignment agreement, which contemplated the transfer of the limited life rights portion of AMI's agreement to an entity that had been set up by Cohen for $125,000. The consultant delivered the signed assignment agreement to Cohen, along with an invoice from a shell corporation incorporated by the consultant for the payment of $125,000, which falsely stated the payment was for an "agreed upon 'flat fee' for advisory services." However, in or about early October 2016, after the assignment agreement was signed but before Cohen had paid the $125,000, Pecker contacted Cohen and told him that the deal was off and that Cohen should tear up the assignment agreement.

7. Following the 2016 presidential election, AMI published articles written by the model in *OK! Magazine* and *Star Magazine*, featured her on the cover of *Muscle & Fitness Her's*, and published articles in *Radar Online* featuring the model. The publication of these articles was intended, at least in part, to keep the model from commenting publicly about her story and her agreement with AMI.

8. At all relevant times, AMI knew that corporations such as AMI are subject to federal campaign finance laws, and that expenditures by corporations, made for purposes of influencing an election and in coordination with or at the request of a candidate or campaign, are unlawful. At no time did AMI report to the Federal Election Commission that it had made the $150,000 payment to the model.

9. AMI has cooperated with the United States Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation during its investigation and provided substantial and important assistance to the investigating agents and prosecutors during the course of the grand jury investigation in the Southern District of New York. Among other things, AMI has made various personnel from AMI available for numerous interviews; engaged outside counsel to ensure the integrity of its compliance with and responses to subpoenas; and responded to numerous requests from prosecutors for various specific items of information. AMI has also agreed in connection with the Non-Prosecution Agreement to implement specific improvements to its internal compliance to prevent future violations of the federal campaign finance laws.