**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

       *Plaintiff*,

   v.

U.S. DEPARTMENT OF JUSTICE,

       *Defendant*.

</td><td>

Civil Action No. 19-2267 (LLA)

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a motion for summary judgment by Defendant, the U.S. Department of Justice ("DOJ"), ECF No. 25, and a cross-motion for summary judgment by Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"), ECF No. 27. Plaintiff claims that DOJ violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by unlawfully withholding certain records pertaining to an investigation into potential campaign finance violations and obstruction of justice by individuals associated with Donald Trump's presidential campaign. The court will partially grant DOJ's motion for summary judgment and deny CREW's motion for summary judgment.

### I.      Background

### A.      DOJ's Investigation

The documents at issue in this case originate with Special Counsel Robert S. Mueller's investigation into Russian interference in the 2016 presidential election. During the course of the Special Counsel's broader investigation, officials discovered evidence suggesting that Michael Cohen, President Trump's former attorney, had engaged in potential wire fraud and violations of the Federal Election Campaign Act, 52 U.S.C. § 30101 *et seq*. Special Counsel Robert S. Mueller,

III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* ("*Special Counsel Report*"), Vol. I App'x D, at D-4 (Mar. 2019).[1]  The Special Counsel referred this evidence to the U.S. Attorney's Office for the Southern District of New York ("SDNY") and the Federal Bureau of Investigation ("FBI") New York Field Office, which opened an investigation in February 2018.  *Id.*; *see* ECF No. 25-4; ECF No. 27-5, at 6-8.  SDNY prosecutors later charged Mr. Cohen with one count of unlawful corporate contribution, one count of making an excessive campaign contribution, five counts of tax evasion, and one count of making false statements to a bank.  ECF No. 25-2 ¶¶ 6-7.

In August 2018, Mr. Cohen pleaded guilty to several felony counts and admitted that he had coordinated a series of illegal contributions to President Trump's campaign.  *See generally* ECF No. 27-6; ECF No. 27-7.  Specifically, he admitted to making hush-money payments to two women who claimed to have had extra-marital affairs with President Trump in order to prevent their stories from coming to light until after the election.  ECF No. 27-7, at 11-14.  Government filings make clear that the scheme was conducted in coordination with other individuals, including executives at American Media, Inc. ("AMI"), a corporation with which DOJ entered into a non-prosecution agreement.  *Id.* at 11-14;[2] ECF No. 27-12, at 6.  Several senior campaign officials, including President Trump, were implicated in the scheme.  ECF No. 27-6, at 12 (asserting that Mr. Cohen "and one or more members of the [Trump] campaign[] offered to help deal with negative stories"); ECF No  27-7, at 11 (explaining that Mr. Cohen "coordinated his actions with

---

[1] The full report is available at https://perma.cc/GZQ4-JFPJ.

[2] ECF No. 27-7—the Government's Sentencing Memorandum in *United States v. Cohen*, No. 18-CR-602—refers to "Corporation-1."  This entity is AMI.  ECF No. 27-1, at 3; *see* ECF No. 27-7 (describing the actions taken by Corporation-1); ECF No. 27-12, at 5-6 (same, but naming AMI).

one or more members of the campaign, including through meetings and phone calls, about the fact, nature, and timing of the payments").

SDNY prosecutors, assisted by the FBI, conducted a related investigation into whether "certain individuals made false statements, gave false testimony or otherwise obstructed justice in connection with the campaign finance investigation."  ECF No. 25-2 ¶ 9.  Both investigations continued through 2019.  *Id.* ¶ 6.  No individuals other than Mr. Cohen were charged based on either investigation.  *Id.* ¶¶ 7, 9.

The Special Counsel's investigation proceeded in parallel with the SDNY investigation.  *See* ECF No. 27-1, at 2-3.  President Trump publicly criticized DOJ during the investigations and made several attempts to interfere.  *Special Counsel Report*, Vol. II, 1-7, 48-61, 77-98, 107-13.  In particular, he criticized then-Attorney General Jeff Sessions for recusing from the investigation. *Id.* at 3-4, 111.  Mr. Sessions resigned in November 2018, and William Barr replaced him as Attorney General in February 2019.  ECF No. 27-1, at 9.

## B.    CREW's FOIA Requests

CREW filed several FOIA requests in July 2019, seeking records "related to the now closed investigation conducted by [the SDNY] into (1) who, besides Michael Cohen, was involved in and may be criminally liable for the two campaign finance violations to which Mr. Cohen pled guilty; and (2) whether certain individuals made false statements, gave false testimony, or otherwise obstructed justice in connection with [the] investigation."  ECF No. 25-5, at 4.  CREW specifically sought "witness statements, investigative reports, prosecution memoranda, and FBI 302s,"[3] and requested expedition because of the "exceptional media interest" at issue and the potential for the

---

[3] FBI 302s are formal witness interview records memorialized on a standard form.  *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 99 n.24 (D.C. Cir. 2011).

records to raise "questions about the government's integrity that affect public confidence." *Id.* at 4, 6.  At the end of July, CREW filed suit challenging DOJ's refusal to expedite.  ECF No. 1, at 1, 9.  The following month, CREW amended its complaint and added a claim for wrongful withholding of non-exempt records.  ECF No. 6, at 12.

The parties have worked together to resolve many of their disputes, such that only three groups of documents remain at issue: (1) three memoranda and associated correspondence between SDNY and DOJ leadership from November 29, 2018 through March 2, 2019 (the "SDNY Correspondence"); (2) materials related to search warrants; and (3) documents related to interview records, including documents created as a result of the interviews and the underlying materials shared with interviewees as part of the process.  *See generally* ECF Nos. 30, 32, 44.

The parties filed cross-motions for summary judgment in 2021.  ECF Nos. 25, 27.  In July 2023, DOJ filed notice with the court that it had become aware of new information that could be relevant to the case.  ECF No. 35, at 1.  The court (Sullivan, J.) stayed the case to allow the parties to determine whether an agreement could be reached to further narrow the documents at issue.  ECF No. 44, at 1.  The case was subsequently reassigned to the undersigned.  Dec. 14, 2023 Dkt. Entry.  In February 2024, the parties informed the court that they had agreed to exclude a large group of documents pertaining to interview records from the case.  *Id.* at 3.  Nevertheless, they maintained that the legal issues raised in their 2021 cross-motions remained ripe and in need of decision.  *Id.* at 3-4.  The court lifted the stay, Feb. 26, 2024 Minute Order, and now turns to the pending motions.

## II.    Legal Standard

The purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Am. C.L. Union v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C.

4

Cir. 2011) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).   Congress nonetheless included nine exemptions to disclosure that "are intended 'to balance the public's interest in governmental transparency against the legitimate governmental and private interests [that] could be harmed by release of certain types of information.'"   *Tipograph v. Dep't of Just.*, 83 F. Supp. 3d 234, 238 (D.D.C. 2015) (quoting *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010)).

"[T]he vast majority of FOIA cases can be resolved on summary judgment."   *Brayton v. Off. of Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).   A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The agency invoking a FOIA exemption bears the burden of demonstrating it applies.   *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).   Summary judgment may be awarded to the agency if it can demonstrate that no material facts are in dispute, that it conducted an adequate search for responsive records, and that each record has either been produced or is exempt from disclosure. *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 59 F. Supp. 3d 184, 189 (D.D.C. 2014).   This burden is met when agency affidavits or declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."   *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).   "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. Cent. Intel. Agency*, 473 F.3d 370, 374-75 (D.C. Cir. 2007) (quoting *Gardels v. Cent. Intel. Agency*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).   "To successfully challenge an agency's showing

that it complied with the FOIA, the plaintiff must come forward with specific facts demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Manna v. U.S. Dep't of Just.*, 106 F. Supp. 3d 16, 18 (D.D.C. 2015) (quoting *Span v. U.S. Dep't of Just.*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010)).

FOIA authorizes the court, within its "broad discretion," to examine requested agency records "*in camera* to determine whether such records or any part thereof shall be withheld" under any of the law's exemptions. *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998); 5 U.S.C. § 552(a)(4)(B). *In camera* review is generally disfavored, but it may be appropriate where agency affidavits are "conclusory . . . or if they are too vague or sweeping." *Protect Democracy Project v. U.S. Nat'l Sec. Agency*, 443 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

### III.   Discussion

#### A.   The SDNY Correspondence

DOJ invokes FOIA Exemptions 5, 6, and 7(C) to justify its withholding of the SDNY Correspondence, which is comprised of two groupings of memoranda and emails shared between SDNY officials, the Office of the Attorney General ("OAG"), and the Office of the Deputy Attorney General ("ODAG") from late 2018 into early 2019. ECF No. 25, at 34-38; ECF No. 27-1, at 14-15; ECF No. 30, at 9-21. The first batch of correspondence originated in November 2018. DOJ states that around that time, ODAG requested that the SDNY "provide a list of certain current open investigations, along with current investigative steps." ECF No. 25-2 ¶ 36. The SDNY shared this list, which consisted of "a brief description of the investigation, its status, and anticipated investigative steps" in a November 29, 2018 email. *Id.* ODAG later asked the SDNY to create a memorandum summarizing these investigations, which resulted in a December 15 memorandum "address[ing] the current status" of the pending investigations. *Id.* ¶ 38. The second

batch of correspondence was created "in connection with a meeting between the [newly confirmed] Attorney General and the Deputy U.S. Attorney on or about February 25, 2019." *Id.* ¶ 41. A memorandum dated February 22, 2019 "summarized" sensitive pending investigations in advance of the meeting, and a subsequent March 1 memorandum "was prepared to provide additional information and to respond to certain questions asked by the Attorney General at the February 25 meeting." *Id.*

The court finds that the portions of DOJ's declarations related to the SDNY Correspondence are too conclusory and vague to support application of Exemptions 5, 6, or 7(c). However, as discussed further below, instead of ordering disclosure or *in camera* review of the correspondence, the court will permit DOJ to supplement its declarations ex parte and under seal.

### 1.      Exemption 5

FOIA Exemption 5 permits the government to withhold "intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To fall within the exemption, a document's "source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). DOJ invokes two bases for Exemption 5: the deliberative process privilege and the attorney work-product privilege. ECF No. 25-1, at 34-37. Both fail at this stage.

*Deliberative Process Privilege.* "The deliberative process privilege 'covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated.'" *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021) (quoting *Klamath Water Users Protective Ass'n*, 532 U.S. at 8). Its purpose is to "prevent injury to the quality of agency decisions" that might

otherwise be chilled or tempered by the possibility of disclosure.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).  To fall within its protection, a document must be both predecisional, meaning that it was created prior to the adoption of a particular position or policy, and deliberative, in that it reflects "the give-and-take of the consultative process."  *Judicial Watch Inc. v. U.S. Dep't of Defense*, 847 F.3d 735, 739 (D.C. Cir. 2017) (quoting *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010)).  Such a determination is highly dependent on the particular circumstances under which a document is created.  *See Judicial Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 55-57 (D.C. Cir. 2021) ("*Judicial Watch I*").  The agency invoking the privilege bears the burden of proof and must explain "(1) 'what deliberative process is involved' and (2) 'the role played by the documents in issue in the course of that process.'"  *Id.* at 55 (quoting *Senate of Puerto Rico v. U.S. Dep't of Just.*, 823 F.2d 574, 585-86 (D.C. Cir. 1987)).  The agency should also explain the "decisionmaking authority" of the author of the document and the "relative positions in the agency's chain of command occupied by the document's author and recipient." *Id.* (quoting *Senate of Puerto Rico*, 823 F.2d at 586).

DOJ has not carried its burden because it does not explain how the SDNY Correspondence is predecisional or how it is deliberative.  Crucially, DOJ has not identified what deliberative process or decision is in play.  It states that when a subordinate litigating component like the SDNY provides information to the OAG or ODAG, the superior components are deciding "whether and how to weigh in on the investigations, including by endorsing, modifying, or rejecting the contemplated actions of subordinate offices, especially when information relates to high-profile and sensitive investigations."  ECF No. 30, at 10 (citing ECF No. 25-11 ¶¶ 13-15, 17-18, 21).  This does not clarify "what deliberative process is involved"—instead, it vaguely gestures to some undefined potential decision.  *See Judicial Watch I*, 20 F.4th at 55.  The court does not know "the

'where,' i.e., the stage within the broader deliberative process in which the withheld material operates; and the 'how,' i.e., the way in which the withheld material facilitated agency deliberation." *Id.* at 56.

*Reporters Committee* provides a useful point of reference.  3 F.4th 350.  There, the court held that the privilege applied to a batch of emails discussing the FBI director's draft letter to the editor of a major newspaper in which he defended a departmental policy.  *Id.* at 362.  The emails served to "figure out how to best promote and ensure the continuation of the FBI's policy in the face of intense congressional and public criticisms."  *Id*. at 363.  The "where" and "how" were clear—the emails arose in the early stages of the letter-drafting process and informed the contours of the final letter.  *Id.* at 363-64.  There is no corollary here.  Although the declarations provided here make reference to the potential prosecution of individuals other than Mr. Cohen, they lack a clear explanation of how the SDNY Correspondence relates to any concrete decision, like a commitment to prosecute or a public relations strategy for the investigation.  FOIA demands more.

As CREW notes, an intra-case comparison is additionally revealing.  As part of his declaration, SDNY Assistant United States Attorney Thomas McKay describes three memoranda created in March and August 2018 as "classic prosecution memoranda."[4]  ECF No. 25-2 ¶ 33.  He specifies that two were prepared by Assistant United States Attorneys for review by SDNY Executive Staff, and another was prepared by the Deputy United States Attorney for review and consideration by the Deputy Attorney General and his staff.  *Id.* ¶ 32.  Mr. McKay uses specific terms to describe their content: the memoranda evaluate the nature of the evidence, strength of the case, what charges should be instituted, and more.  *Id.* ¶ 33.  Next, he identifies decisions

---

[4] CREW does not contest DOJ's withholding of these memoranda.  ECF No. 27-1, at 12-13 n.1.

implicated by the memoranda, like whether to bring criminal charges or take certain investigative steps. *Id.* ¶ 34. Mr. McKay clearly explains how those memoranda "formed an important part" in tangible, specific decisions. *Id.*

Mr. McKay's description of the SDNY Correspondence is markedly different. He states that the documents were prepared by SDNY officials at the request of ODAG and he notes that they "describe[] the status" of the relevant investigations. *Id.* ¶ 35. Rather than identifying a particular decision, like an investigative step, his descriptions are one level removed—the documents were prepared "for the purpose of briefing" and to "provide additional information." *Id.* ¶¶ 40-41. Although Mr. McKay broadly states that the memoranda were produced in "anticipation of litigation," he does not identify a decision (like a prosecution) or decisionmaker (like the Deputy Attorney General). Nor does he explain how the documents played a role in any process. Because it is not clear "what deliberative process [was] involved" or how the documents contributed to deliberations, DOJ cannot invoke the deliberative process privilege on the record currently before the court. *Judicial Watch, Inc. I*, 20 F.4th at 55 (quoting *Senate of Puerto Rico*, 823 F.2d at 585).

*Work Product Privilege.* The work-product privilege protects "materials 'prepared in anticipation of litigation or for trial by or for another party or its representative." *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) ("*Judicial Watch II*") (quoting Fed. R. Civ. P. 26(b)(3)(A)). The privilege protects the adversarial process, ensuring that an attorney's thoughts and mental impressions cannot be used against them. *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just.*, 844 F.3d 246, 251 (D.C. Cir. 2016). To assess its applicability, the court must make a "case-specific determination that a particular document in fact was prepared in anticipation of litigation." *Id.* The D.C. Circuit has created a two-part test for the privilege: first,

the author of the document must have believed litigation was a real possibility at the time the document was created; second, the document must have been created "because of" the prospect of litigation. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 391 F. Supp. 3d 43, 50-51 (D.D.C. 2019) ("*Judicial Watch III*"); *see Equal Emp't Opportunity Comm'n v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999). The government must satisfy both prongs. *Judicial Watch III*, 391 F. Supp. 3d at 50-51. The privilege must be narrowly construed, and it "does not extend to a 'government attorney's advice on political, strategic, or policy issues, valuable as it may [be].'" *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 538 F. Supp. 3d 124, 135 (D.D.C. 2021) ("*CREW I*") (quoting *Judicial Watch II*, 926 F. Supp. at 144-45). "The government cannot satisfy [its] burden with affidavits that are vague or conclusory, or merely parrot the statutory standard." *Env't Integrity Project v. Small Bus. Admin.*, 151 F. Supp. 3d 49, 53 (D.D.C. 2015).

For many of the same reasons explained above, DOJ has not carried its burden to support application of the work-product privilege. DOJ's declarations are so conclusory that the court cannot determine with certainty whether the privilege applies. *Larson*, 565 F.3d at 862. Mr. McKay states that the SDNY Correspondence was "prepared in anticipation of potential prosecution of one or more individuals," including an individual or individuals other than former President Trump. ECF No. 25-2 ¶¶ 39, 42; ECF No. 30-1 ¶¶ 9-13. However, DOJ does not provide detailed and specific information supporting a credible conclusion that litigation was sufficiently concrete to warrant work-product privilege—it merely restates the legal standard with little more detail. *See* ECF No. 25-2 ¶¶ 39, 42; ECF No. 30-1 ¶¶ 9-13.

The lack of detail is problematic because it is not obvious whether the author of the documents believed that litigation was a real possibility or whether the documents were created "because of" the prospect of litigation. *Judicial Watch III*, 391 F. Supp. 3d at 50-51. The

documents at issue "describe the status" of the relevant investigations and "provide additional information" to agency higher-ups.  ECF No. 25-2 ¶¶ 35, 40-41, 43.  It is not clear whether the documents would have been prepared but-for the alleged "potential prosecution" to which DOJ gestures.  *Judicial Watch III*, 391 F. Supp. 3d at 51 (explaining that the "germane inquiry is whether [documents] would have been prepared . . . but for [an] impending prosecution").  If the documents would have been prepared regardless of any specific litigation, they could not have been prepared "because of" it.  *See id.*

The relevant declarations—from Mr. McKay and Timothy Ziese, Senior Supervisory Attorney in DOJ's Office of Information Policy—provide little useful detail to make this assessment.  In *Judicial Watch III*, the court determined that documents were protected work product where an agency declaration established that the records were created "for the purpose of gathering evidence that could be presented to a grand jury and that could factor into the case to be presented at the trial."  *Id.*  Such a statement explicitly connected the withheld records to clear litigation decisions: presentation to a grand jury and at an eventual jury trial.  *See id.*  That type of connection is lacking here.  Mr. Ziese contends that the December 15, 2018 memorandum was "prepared in anticipation of litigation because it discusses the nature of ODAG's request for information regarding the status of particular investigations and prosecutions of interest to ODAG."  ECF No. 25-11 ¶ 17.  Similarly, Mr. McKay states that the memoranda "were prepared in anticipation of litigation, specifically the potential prosecution of individuals other than Michael Cohen," but he provides no details related to concrete litigation steps.  ECF No. 25-2 ¶¶ 39, 42.  The declarations overwhelmingly suggest that the records were created for the purpose of briefing senior DOJ leadership on the status of the investigations—hardly a clear litigation purpose.  *Id.* ¶¶ 40-41 (explaining that the relevant documents were created for the "purpose of briefing senior

DOJ leadership" and to "provide additional information and to respond to certain questions asked by the Attorney General"); ECF No. 25-11 ¶¶ 17-18 (same).

DOJ seems to suggest that because these records were created by lawyers, in the context of their jobs as prosecutors, it is obvious that credible litigation would follow.  But that is not the test.  "[I]f the agency were allowed 'to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies  the FOIA would largely be defeated.'"  *Senate of Puerto Rico*, 823 F.2d at 587 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)).  Just because a senior DOJ official *could* choose to make a litigation-related decision after reviewing a document does not mean that he necessarily would.  That does not clear the bar set by FOIA.[5]

This is an instance where the government's declarations simply lack reasonably specific detail.  *Judicial Watch II*, 726 F.3d at 215.  For that reason, Exemption 5 is inapplicable to the SDNY Correspondence on the record currently before the court.

## 2.    Exemptions 6 & 7(C)

Exemptions 6 and 7(C) both protect personal privacy interests.  5 U.S.C. § 552(b)(6), (7)(C).  Exemption 6 allows agencies to withhold "personnel and medical files and similar files" in circumstances where disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or

---

[5] CREW raises an additional ground for doubt.  Contending that the only remaining target of the investigation was President Trump, it argues that the documents could not have been prepared in contemplation of litigation because DOJ policy prohibits prosecution of a sitting president.  ECF No. 27-1, at 18-20, 25-26; ECF No. 32, at 4-9; ECF No. 27-13; *see CREW I*, 538 F. Supp. 3d at 140-41.  The court need not reach this argument because DOJ's declarations are deficient irrespective of the target of the investigation.

information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy. *Id.* § 552(b)(7)(C). Analysis of these two exemptions is overlapping, although Exemption 7(C) is "more protective of privacy than Exemption 6" and thus presents a lower bar for the government. *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994); *Electronic Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 718 n.5 (D.C. Cir. 2021) ("*EPIC*"). In assessing whether disclosure is warranted, the court must "balance the [] privacy interest against the public interest in disclosure." *EPIC*, 18 F.4th at 718 (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004)). "[T]he only relevant 'public interest in disclosure' . . . is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government*.'" *U.S. Dep't of Def.*, 510 U.S. at 495 (emphasis in original) (quoting *Reps. Comm.*, 489 U.S. at 775). Such interests include an understanding of the manner in which the federal government "handle[s] the investigation and prosecution of crimes that undermine the very foundation of our government." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1093 (D.C. Cir. 2014) ("*CREW II*").

DOJ invokes Exemptions 6 and 7(C) to withhold portions of the SDNY Correspondence, rather than the full tranche of documents. ECF No. 30, at 19. The privacy interest at issue is potentially strong because, generally, "individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." *EPIC*, 18 F.4th at 718 (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (D.C. Cir. 2017) ("*CREW III*")). But this privacy interest is "somewhat diminished" for public officials and those who have already been publicly connected to an investigation. *Id.* at 719 (quoting *CREW II*, 746 F.3d at 1092). As CREW notes, DOJ's

descriptions of the documents they seek to withhold are quite vague, such that CREW—and the court—cannot assess how the privacy interest applies.  ECF No. 32, at 12.

The parties define the public interest in this case differently.  DOJ characterizes the public interest as "inform[ing] the public about why the Department declined to prosecute any individuals besides Mr. Cohen."  ECF No. 25-1, at 19.  CREW points to two slightly more specific purposes: (1) showing whether "DOJ pulled its punches in the investigation of President Trump"; and (2) revealing "the extent to which the President's use of his appointment powers improperly influenced investigations of his personal conduct."  ECF No. 27-1, at 27-28.  CREW has the better of the argument, as there is a weighty public interest in learning how DOJ "carried out [its] statutory duties to investigate and prosecute criminal conduct."  *EPIC*, 18 F.4th at 721.

While the public interest is strong, the privacy interests at issue could potentially outweigh it, depending on the particular identities of those implicated.  The court thus lacks the information it needs to appropriately assess application of Exemptions 6 and 7(C).

### 3.    Supplemental Declarations

"[W]hen an agency's affidavits or declarations are deficient . . . courts generally will request that the agency supplement its supporting declarations."  *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002); *Spirko*, 147 F.3d at 997 ("If the agency fails to provide a sufficiently detailed explanation . . . the district court then has several options, including . . . requesting further affidavits[.]").  Such an approach is preferred to *in camera* review of the underlying documents, which "should not be resorted to as a matter of course, simply on a theory that 'it can't hurt.'"  *Spirko*, 147 F.3d at 997 (quoting *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996)); *see Isiwele v. U.S. Dep't of Health and Hum. Servs.*, 85 F. Supp. 3d 337, 344 (D.D.C. 2015).

CREW suggests that the applicability of Exemptions 5, 6, and 7(C) "hinges in part on questions that that would very likely be answered by *in camera* review." ECF No. 32, at 9. The court agrees that more detailed information will likely resolve this dispute. DOJ states Mr. McKay can "provide more detailed information in an additional declaration provided ex parte and under seal." ECF No. 30, at 11-12 n.7 (quoting ECF No. 25-2 ¶ 43). The court is amenable to DOJ's suggestion.[6] Accordingly, with respect to the SDNY Correspondence, the court denies DOJ's motion for summary judgment without prejudice to its renewal accompanied by supplemental declarations.[7]

## B.     Documents Related to Search Warrants

DOJ invokes FOIA Exemptions 6 and 7(C) to justify its withholding of four batches of search warrant records. The documents include internal FBI records memorializing the execution of a search and various supporting documentation for the warrants like applications and supporting affidavits. ECF Nos. 25-2 ¶ 47; ECF No. 25-4, at 5. Both batches of documents relate to the campaign finance investigations. ECF No. 25-2, ¶¶ 48, 50. The first group relates to an April 2018 warrant and resulting search of "various property of Mr. Cohen to obtain evidence in furtherance of the campaign finance investigation." *Id.* ¶ 48. The second group relates to a July 2018 search of "email accounts and stored electronic communications of certain third parties." *Id.* ¶ 50. The court finds that Exemptions 6 and 7(C) apply and DOJ may withhold the records.

---

[6] The court declines to consider the underlying documents *in camera* at this stage. *See Spirko*, 147 F.3d at 997.

[7] Because the court finds that the current record does not support a definitive holding one way or another on the exemptions, it declines to engage in the foreseeable harm analysis established by the FOIA Improvement Act of 2016. 5 U.S.C. § 552(a)(8)(A)(i)(I); *Reps. Comm.*, 3 F.4th at 369 (explaining agencies must identify specific harms that would result from disclosure, even if the requirements for withholding are met). It would be premature for the court to engage in such analysis at this stage because the court has not found that any exemptions apply. Should the court later come to such a conclusion, it will apply the relevant test.

Again, the court must "balance the [] privacy interest against the public interest in disclosure." *EPIC*, 18 F.4th at 718 (quoting *Favish*, 541 U.S. at 171).  The privacy interests of the affected individuals are strong.  "There is little question that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarrassment and potentially more serious reputational harm." *SafeCards Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991) (quoting *Senate of Puerto Rico*, 823 F.2d at 588).  DOJ argues that release of these materials "would likely reveal the identities of individuals, other than Mr. Cohen, whose property was seized in connection with [the campaign finance] investigation"  ECF No. 25-2 ¶ 53.  Disclosure may also reveal the identities of other "person(s) of investigative interest." *Id.*  These individuals were not charged and their identities have not been publicly disclosed. *Id*. ¶¶ 7, 9, 52-53.  The court thus concludes that these individuals have a strong, well-accepted interest in maintaining their privacy. *See, e.g.*, *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992) (explaining that targets of investigations have a substantial privacy interest, as do third parties mentioned in law enforcement records); *CREW III*, 854 F.3d at 682 (explaining that "individuals have an obvious privacy interest . . . in keeping secret the fact that they were subjects of a law enforcement investigation" (quoting *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995)); *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984) (explaining that "individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity").

CREW argues that any individuals the government has already publicly linked to the investigation have a diminished privacy interest.  ECF No. 27-1, at 36.  Not so.  DOJ clarifies that although the names of "one or more of the relevant individual(s) have appeared in other government documents, the fact that these individual(s)' property was subject to search has *not* been officially acknowledged or disclosed."  ECF No. 30, at 16 (citing ECF No. 25-2 ¶ 52).  These

individuals retain a strong privacy interest because disclosure of the documents would reveal previously unknown details about their involvement with the campaign finance investigation. *See CREW II*, 746 F.3d at 1092 (explaining that even if "the fact that [an individual] was under investigation" has been disclosed, that individual "retain[s] a second, distinct privacy interest in the *contents* of the investigative files").

As to the public interest, CREW draws heavily from *EPIC*. ECF No. 32, at 9-15. There, the D.C. Circuit ordered disclosure of information related to Special Counsel Robert Mueller's campaign finance investigation. 18 F.4th at 722. Although strong 7(C) privacy interests were at stake, the Court held that the significant public interest in learning whether the Special Counsel "had the evidence but nevertheless pulled its punches" won out. *Id.* at 721 (quoting *CREW II*, 746 F.3d at 1093). CREW argues that this case is similar because disclosure of the "search records would help the public understand whether DOJ failed to use the full breadth of its powers while investigating the President's role in Cohen's offenses and the President's efforts to conceal the hush-money scheme." ECF No. 32, at 13. CREW is correct that there is a strong public interest in learning whether DOJ properly exercised its power to prosecute campaign finance crimes or if, instead, the SDNY "pulled punches or Department leadership intervened." ECF No. 32, at 13; *see EPIC*, 18 F.4th at 721. However, CREW does not make clear how the search warrant records are "likely to advance that interest." *EPIC*, 18 F.4th at 721 (quoting *Favish*, 541 U.S. at 171).

In *EPIC*, the plaintiff sought "disclosure of passages contain[ing] detailed legal analysis that show[] how the Special Counsel interpreted the relevant law and applied it to the facts" as part of his decision to decline prosecution. *Id.* The court reasoned that that information was closely connected to "substantive matters of important law enforcement policy" such that disclosure would allow the public to understand how DOJ leadership had approached the investigation. *Id.* Further,

18

the Court determined that it did not matter that the relevant law and facts had already been publicly disclosed, because the Special Counsel's legal analysis had not been. *Id.*

The situation is materially different in this case. Unlike the Special Counsel's legal analysis in *EPIC*, the search warrant records at issue here largely contain factual assertions devoid of legal analysis that may shed light on DOJ's prosecutorial strategy. *See* ECF No. 25-2 ¶ 47; ECF No. 25-4, at 5. Further, much of this factual material has already been released through public filings in Mr. Cohen's criminal proceedings. ECF No. 25-2 ¶¶ 52, 54. These are not memoranda comprised of probative communication between DOJ and the SDNY or documents analyzing the strength of a potential criminal charge. Accordingly, the information in the search warrants is disconnected from the public interest at issue. *See EPIC*, 18 F.4th at 721-22.

On balance, then, the substantial privacy interests prevail because, although CREW's articulated public interest is weighty, the nexus between that interest and the documents is tenuous. The court thus concludes that Exemptions 6 and 7(C) apply.

### C.      Interview Records and 302s

DOJ invokes FOIA Exemptions 5, 6, and 7(C) to justify its withholding of reports and notes of interviews conducted during the SDNY's investigations into potential campaign finance violations and obstruction of justice. The relevant documents include FD-302s, interview memoranda, and handwritten interview notes created between February 2018 and April 2019.[8] ECF No. 25-1, at 6-7; ECF No. 25-2 ¶¶ 11-13. These documents were prepared by FBI Special Agents, SDNY Agents, and other prosecutors around interviews that occurred on April 19, 2018

---

[8] At the time the parties initially filed their cross-motions for summary judgment, this category of documents included every record listed in the *Vaughn* index under the heading "Interview Records." ECF No. 25-4, at 2-3. The parties have since agreed to remove a subset of these records. ECF No. 44, at 2-3.

and January 14, 2019.  ECF No. 25-2 ¶ 12.  DOJ has already released redacted versions of similar records stemming from interviews with individuals that have publicly acknowledged their involvement in the investigation.  ECF No. 25-3 ¶¶ 21-22.  The remaining withheld documents are "associated with interviews for which neither the witnesses nor the government have publicly acknowledged . . . participation."  *Id.* ¶ 22.

The court concludes that these materials qualify as work product protected under Exemption 5.  These records are at the heart of the work-product privilege.  Unlike with other records at issue in this case, the court is able to determine from DOJ's declarations that the authors of these materials believed that litigation was a real possibility at the time of their creation and that the documents were created "because of" the prospect of litigation.  *Judicial Watch III*, 391 F. Supp. 3d at 50-51.  Mr. McKay states that the interviews and corresponding documents were created by "prosecutors anticipat[ing] the potential for criminal charges" and drafted "in connection with the prosecutors' evaluation of whether criminal prosecutions were warranted." ECF No. 25-2 ¶¶ 15-16.  These statements are comparable to those the court found sufficient in *Judicial Watch III*.  391 F. Supp. 3d at 50-51 (determining that the attorneys had a reasonable belief of litigation where an attorney familiar with the investigation stated that the interviews were conducted while the government was moving toward an indictment).

The court is further satisfied that the documents were created "because of" the potential for prosecution.  *Id.*  Mr. McKay explains that "[t]he [underlying] interviews were conducted and recorded to gather and assess the extent to which evidence could be obtained to support criminal charges" for a "grand jury or at trial."  ECF No. 25-2 ¶ 15.  He states that disclosure would reveal the prosecutors' mental impressions because they crafted the questions to be asked, selected which documents would be used during interviews, and directed the "focus and emphasis" of interviews.

*Id.* ¶ 16.   Disclosure of such detailed information would surely reveal the prosecutors' legal analysis, including their theory of the case and other strategic assessments.   *See Hickman v. Taylor*, 329 U.S. 495, 508 (1947).   There would have been no reason to conduct the interviews, particularly with the involvement of prosecutors, absent a possible prosecution.   Further, the court notes that many of the interview records at issue in this litigation have already been held to constitute protected attorney work product by the Southern District of New York and the Second Circuit for many of the same reasons stated here.   *See Am. Oversight v. U.S. Dep't of Justice*, No. 19-CV-8215, 2021 WL 964220 (S.D.N.Y. Mar. 15, 2021), *aff'd*, 45 F.4th 579 (2d Cir. 2022).

It does not matter that some of the records were created by FBI or SDNY Special Agents because the prosecutors directed their actions and designed the interviews.   ECF No. 25-2 ¶¶ 12, 15.   It is well established that the work-product privilege extends to materials created by an attorney's agent.   *United States v. Nobles*, 422 U.S. 225, 238-39 (1975) (explaining that the work-product privilege extends to the agents of an attorney because "attorneys often must rely on the assistance of investigators . . . in preparation for trial"); *Judicial Watch III*, 391 F. Supp. 3d at 50 (same).   Relevant case law makes clear that interview records created by FBI agents, under the direction of prosecutors, qualify as attorney work product.   *See, e.g.*, *Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 11-15 (D.D.C. 2020); *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 806 F. App'x 5, 6-7 (D.C. Cir. 2020) ("[W]e have long held that documents prepared by non-attorneys in anticipation of litigation may also be protected by the privilege.").   In *Judicial Watch III*, the court was able to conclude that the work-product privilege applied from an affidavit in which a government declarant explained that "[p]rosecutors participated in selecting the[] witnesses," discussed  "investigative strategy for each interview," and "steered investigative efforts, focusing on information needed to make charging decisions."   391 F. Supp. 3d at 52.   That is the case here,

too, where Mr. McKay explains that "SDNY prosecutors selected the witnesses to interview, discussed and determined in advance the investigative strategy for witness interviews, and in most cases led the interviews."  ECF No. 25-2 ¶ 10.

CREW argues that the applicability of Exemption 5 to the interview records "hinges in part on questions that would very likely be answered by *in camera* review of the SDNY Correspondence" because if "no litigation was reasonably foreseeable in late 2018 or early 2019, the interview records drafted during that same period were not attorney work-product."  ECF No. 32, at 9.  The court is not persuaded.  The court must assess the work-product privilege's applicability to each particular document requested.  *Nat'l Ass'n of Crim. Def. Laws.*, 844 F.3d at 251.  With respect to the interview records, DOJ has provided detailed explanations of the process by which the documents were created, such that the court is satisfied that the exemption applies.  *Id*.  In particular, Mr. McKay's declarations provide sufficient context for the court to concludes that the documents were created "because of" potential prosecutions.[9]

### IV.    Conclusion

For the foregoing reasons, DOJ's Motion for Summary Judgment, ECF No. 25, is **GRANTED** in part and **DENIED** in part.  CREW's Motion for Summary Judgment, ECF No. 27, is **DENIED**.  The parties are directed to file a joint status report proposing next steps in this litigation on or before September 3, 2024.

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: August 20, 2024

---

[9] In light of the court's conclusion that the materials are covered by Exemption 5, it need not address Exemptions 6 and 7(C).  *Am. C.L. Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 n.2 (explaining that withholding is appropriate if records satisfy just one exemption).